[No. E038143. Fourth Dist., Div. Two. Nov. 30, 2006.]

THE PEOPLE, Plaintiff and Respondent, v.
BRANDON VILLALOBOS et al., Defendants and Appellants.

COUNSEL

Kevin D. Sheehy, under appointment by the Court of Appeal, for Defendant and Appellant Brandon Villalobos.

Isaac Guillen for Defendant and Appellant Bernadette Maria Osika.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, David Delgado-Rucci and Ronald A. Jakob, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**McKINSTER, J.**—Defendants appeal their convictions for first degree robbery and burglary, as well as an enhancement imposed for commission of a home invasion robbery committed in association with, for the benefit of or at the direction of a criminal street gang. They contend that an occupied motel room, such as that where these crimes took place, is not an "inhabited dwelling house" within the meaning of the relevant statutes, if the room is rented only for one night.

Burglary is historically a crime against habitation. In most instances, a hotel or motel room is rented for purposes of habitation, albeit on a temporary basis. We will therefore hold that a hotel or motel room that is currently rented as a temporary habitation is an inhabited dwelling for purposes of first degree robbery and burglary, regardless of the length of time for which the room is rented.

### PROCEDURAL HISTORY

Brandon Villalobos and Bernadette Maria Osika (hereafter referred to either by their respective last names or collectively as defendants) were tried jointly but to separate juries on charges arising from an incident at the Peppertree Motel in Ontario. Both defendants were convicted of first degree burglary of an inhabited dwelling house with a person present (Pen. Code, §§ 459, 460, 667.5, subd. (c)); false imprisonment of a person by violence (Pen. Code, § 236); first degree robbery in concert with other persons in an inhabited dwelling house (Pen. Code, §§ 211, 212.5, subd. (a), 213, subd. (a)(1)(A)); and unlawful driving or taking of a vehicle (Veh. Code, § 10851, subd. (a)). Villalobos's jury found criminal street gang allegations

pursuant to Penal Code section 186.22, subdivision (b)(1), to be true as to the burglary, robbery and false imprisonment counts but untrue as to the offense of unlawful taking or driving of a vehicle. Osika's jury found the criminal street gang enhancements true as to all four counts. Villalobos's jury also found true the allegation that Villalobos personally used a dangerous or deadly weapon in the commission of burglary, robbery and false imprisonment. (Pen. Code, § 12022, subd. (b)(1).) Both juries returned true findings on allegations that the robbery was a home invasion robbery within the meaning of Penal Code section 186.22, subdivision (b)(4)(B). The court granted a defense motion pursuant to Penal Code section 1118.1 to dismiss a carjacking count as to both defendants.[1]

Section 186.22, subdivision (b)(4)(B) provides for imposition of a term of 15 years to life upon conviction of a home invasion robbery committed for the benefit of, at the direction of, or in association with a criminal street gang. Accordingly, the trial court sentenced Villalobos to 16 years to life in prison (15 years to life, plus one year for the personal use enhancement) and sentenced Osika to 15 years to life in prison.

Each defendant filed a timely notice of appeal.

## FACTUAL BACKGROUND

On the evening of November 7, 2004, Roy Anthony Miller rented a room at the Peppertree Motel in Ontario. Miller was alone in the motel room for an hour or two, using methamphetamine and awaiting the arrival of Jeanette Howard, a female acquaintance with whom he was planning to "party" in the motel room that night. About 8:00 p.m., Miller answered a call on his cell phone from defendant Osika. Osika wanted to get high and "smoke a bowl" with Miller. Miller was acquainted with Osika but did not want to have her come over because he was anticipating having sex with Howard. However, after a three-way phone call among Howard, Osika and Miller, Miller agreed that Osika could come and smoke some methamphetamine with him.

About five minutes after Osika's arrival, Miller heard a knock on the motel room's door. Miller looked out the peephole, but did not see anyone. He then looked out the window and saw defendant Villalobos and another man standing to the side of the window. He had seen Villalobos before but did not know who he was. He told Osika that he did not know them and was not opening the door. Osika looked out the window and said, "Oh, that's my boyfriend." Osika opened the door and walked out of the motel room as Villalobos and the other man entered.

---

[1] All further statutory citations refer to the Penal Code unless otherwise indicated.

Villalobos and the other man told Miller that they were going to rob him. The two men pointed knives at Miller and ordered him to the floor, but allowed him to lie on the bed instead. Villalobos searched Miller and removed $500 to $700, a wallet and change from his pockets, and took his watch and a necklace. Meanwhile, the other man removed Miller's cell phone, pager, some tools, writing materials, methamphetamine, and a smoking bowl from the table. Villalobos and the other man then left with Miller's money, cell phone and methamphetamine. They did not take his wallet. During the incident Miller felt that he was being held captive. At some point, one of the two men hit Miller in the temple.

After the two men left the motel room, Miller went outside and saw Villalobos drive away with the other man in a white Ford F-150 pickup truck. Miller noticed that his own car was missing from where it had been parked outside. He went back inside the motel room to look for his car keys and noticed that they were missing from the table.

Miller did not call the police immediately. He first called Howard and told her that his money, drugs and car had been stolen. He was very upset and believed that Osika had taken his car. He told Howard that she had better find his car and other property, or he would call the police. Howard told him that she and her son would try to recover the car. Howard's home in Ontario was known as a "drug house," and she was acquainted with both Villalobos and Osika. She did not want Miller to call the police because she was afraid he would implicate her house. A short while later, Miller did call the police and reported the crimes. Early the following morning, a highway patrol officer found Miller's car parked near Villalobos's home in Fontana.

Villalobos was an admitted member of Ontario Varrio Sur (OVS), a criminal street gang. OVS's territory included the location of the Peppertree Motel. Osika was not a member of OVS. Gang experts opined that the crimes were committed for the benefit of OVS.

## DISCUSSION

### A HOTEL OR MOTEL ROOM RENTED AS A TEMPORARY HABITATION IS AN INHABITED DWELLING FOR PURPOSES OF RESIDENTIAL BURGLARY AND ROBBERY

Section 460 provides: "Every burglary of an inhabited dwelling house . . . or the inhabited portion of any other building, is burglary of the

first degree." Section 212.5 provides that "every robbery which is perpetrated in an inhabited dwelling house . . . or the inhabited portion of any other building is robbery of the first degree." Section 459 provides that " 'inhabited' means currently being used for dwelling purposes, whether occupied or not." The terms "inhabited dwelling house" or "inhabited portion of any other building" have the same meaning in both the robbery and burglary statutes.[2] (*People v. Fleetwood* (1985) 171 Cal.App.3d 982, 987–988 [217 Cal.Rptr. 612].)

In this case, the court instructed the jury that "An occupied motel room is an inhabited dwelling house within the meaning of [the] definition [of first degree burglary]." It gave the same instruction with respect to robbery. Defendants contend that by doing so, the trial court violated their due process right to have the jury determine every element of the charged offenses. They argue that the error was not harmless beyond a reasonable doubt. (See *People v. Flood* (1998) 18 Cal.4th 470, 502–503 [76 Cal.Rptr.2d 180, 957 P.2d 869] [error in jury instructions which removes element of offense from jury's consideration is subject to review under standard of *Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824]].) They contend that a motel room that is rented only for one night is not an inhabited dwelling as a matter of law because the law recognizes as an inhabited dwelling only a place the victim views as his *actual* "place of abode" and where he intends to return.[3]

 The Attorney General concedes that the trial court erred by directing the verdict as to the degree of the burglary and robbery, but contends that the error was harmless because it is well established that an "occupied" hotel or motel room is an inhabited dwelling.[4] As discussed above, there is no distinction between individual dwellings and "the inhabited portion of other buildings, such as hotels" as those terms are used in the statutes defining first

---

[2] Although a hotel room is, strictly speaking, not an "inhabited dwelling house" but "an inhabited portion of another building," there is no functional distinction between the two terms. (See *People v. O'Bryan* (1985) 37 Cal.3d 841, 844 [210 Cal.Rptr. 450, 694 P.2d 135].) For convenience, we will refer to hotel and motel rooms as "inhabited dwellings."

[3] Although defendants couch their contention as lack of substantial evidence, in reality their argument is that the undisputed evidence, that Miller lived nearby and rented the room for one night only, is insufficient as a matter of law to support the verdicts of first degree burglary and robbery. The legal sufficiency of undisputed evidence to support a conviction is a question of law which we review de novo. (*People v. Groat* (1993) 19 Cal.App.4th 1228, 1231 [24 Cal.Rptr.2d 15].)

[4] The court did instruct the juries that if they had a reasonable doubt whether the robbery and burglary were of the first or second degree, they were required to find that they were of the second degree. However, that instruction was meaningless, in light of the instructions that a robbery or burglary which takes place in an inhabited dwelling is of the first degree, and that an occupied motel room is an inhabited dwelling.

degree burglary and first degree robbery. (*People v. O'Bryan, supra,* 37 Cal.3d at p. 844; accord, *People v. Fleetwood, supra,* 171 Cal.App.3d at pp. 987–988.) Thus, a motel or hotel room may be the site of a residential first degree robbery or burglary. However, like any other dwelling, a hotel room must be "inhabited" in order for the first degree robbery and burglary statutes to apply. (§§ 213, 456, 460.) The issue before us is whether a motel room, which is rented on a transient or temporary basis, is "inhabited" within the meaning of those statutes. We have found no California cases that directly address that question.

■ The fundamental task of statutory construction is to ascertain the intent of the lawmakers so as to effectuate the purpose of the law. (*People v. Cruz* (1996) 13 Cal.4th 764, 775 [55 Cal.Rptr.2d 117, 919 P.2d 731].) In order to determine whether, or when, an overnight lodging place qualifies as an inhabited dwelling, we must examine the principles underlying the first degree burglary and robbery statutes.

California's burglary law "stems from the common law policy of providing heightened protection to the residence. [Citations.]" (*People v. Cruz, supra,* 13 Cal.4th at p. 775.) At common law, burglary was considered "an offense against habitation rather than against property. The peace of mind and security of the residents was sought to be protected, rather than the property." (*U.S. v. McClenton* (3d Cir. 1995) 53 F.3d 584, 587–588.) Burglary laws are " ' " 'based primarily upon a recognition of the dangers to personal safety created by . . . the danger that the intruder will harm the occupants in attempting to perpetrate the intended crime or to escape and the danger that the occupants will in anger or panic react violently to the invasion, thereby inviting more violence.' " [Citation.]' " (*People v. Hughes* (2002) 27 Cal.4th 287, 355 [116 Cal.Rptr.2d 401, 39 P.3d 432].) As one court explained, "a person is more likely to react violently to burglary of his living quarters than to burglary of other places because in the former case persons close to him are more likely to be present, because the property threatened is more likely to belong to him, and because the home is usually regarded as a particularly private sanctuary, even as an extension of the person." (*People v. Lewis* (1969) 274 Cal.App.2d 912, 920 [79 Cal.Rptr. 650].)

■ In keeping with the purpose of the statute, the term " 'inhabited dwelling house' " has been given a "broad, inclusive definition." (*People v. Cruz, supra,* 13 Cal.4th at pp. 776, 779.) Thus, although an inhabited dwelling house is a place where people " 'ordinarily live and which is currently being used for dwelling purposes' " (*People v. DeRouen* (1995) 38 Cal.App.4th 86, 91 [44 Cal.Rptr.2d 842], disapproved on other grounds in

*People v. Allen* (1999) 21 Cal.4th 846, 865–866 [89 Cal.Rptr.2d 279, 984 P.2d 486]), it "need not be the victim's regular or primary living quarters" in order to be deemed an inhabited dwelling house. (*People v. Fond* (1999) 71 Cal.App.4th 127, 130 [83 Cal.Rptr.2d 660].) Rather, the " ' " 'inhabited-uninhabited' dichotomy turns . . . on the character of the use of the building." ' [Citation.] . . . .'[T]he proper question is whether the nature of a structure's composition is such that a reasonable person would expect some protection from unauthorized intrusion.' [Citation.]" (*People v. DeRouen, supra,* 38 Cal.App.4th at pp. 91–92, italics omitted.) Thus, a temporary place of abode, such as a weekend fishing retreat (*U.S. v. Graham* (8th Cir. 1992) 982 F.2d 315), a hospital room (*People v. Fond, supra,* at pp. 131–132) or even a jail cell (*People v. McDade* (1991) 230 Cal.App.3d 118, 127–128 [280 Cal.Rptr. 912]), may qualify.

In *People v. Fond,* the court held that a hospital room, even though it is shared with a roommate and is to be occupied for less than 24 hours, qualifies as an inhabited dwelling house because the patient would expect to be free from unwarranted intrusions. Noting that residential burglary is deemed more serious than other types of burglary because "it violates the victim's need to feel secure from personal attack," the court held that people "simply need some place where they can let down their guard and where they can sleep without fear for their safety." A hospital room "may represent a special place for repose" to a patient, particularly a psychiatric patient. Therefore, the court held, the determination that a hospital room is a dwelling house "not only satisfies the letter of section 460, subdivision (a), but the spirit as well." (*People v. Fond, supra,* 71 Cal.App.4th at pp. 131–132.)

The same considerations apply to a hotel room, even if it is rented only for one night. People have an expectation of freedom from unwarranted intrusions into a room in which they intend to store their personal belongings, sleep, dress, bathe and engage in other intimate, personal activities. As the Third Circuit Court of Appeals observed, "[a] hotel guest room is intended for use as human habitation, albeit, in most circumstances, on a transient or temporary basis. . . . [¶] . . . '[B]ecause hotels are in the business of housing overnight guests many of the reasons that make traditional dwelling burglaries dangerous [are] likewise present . . . .' [Citation.]" (*U.S. v. McClenton, supra,* 53 F.3d at p. 587.) "Obviously, whether one burglarizes a private home or a hotel room, there is a much greater possibility of confronting the resident and a substantial risk that force will be used and that someone will be injured, than if one burglarized a building that was not intended for use as habitation, such as an office building after office hours or a warehouse." (*Id.* at p. 588.)

The concept of the right to privacy in a hotel room as arising from its status as a sleeping place analogous to the home is recognized in the context of Fourth Amendment search and seizure law as well. "We are at our most vulnerable when we are asleep because we cannot monitor our own safety or the security of our belongings. It is for this reason that, although we may spend all day in public places, when we cannot sleep in our own home we seek out another private place to sleep, whether it be a hotel room, or the home of a friend. Society expects at least as much privacy in these places as in a telephone booth—'a temporarily private place whose momentary occupants' expectations of freedom from intrusion are recognized as reasonable,' [citation]." (*Minnesota v. Olson* (1990) 495 U.S. 91, 99 [109 L.Ed.2d 85, 110 S.Ct. 1684]; see also *Stoner v. Califoria* (1964) 376 U.S. 483, 489 [11 L.Ed.2d 856, 84 S.Ct. 889] [guest in a hotel room receives the same constitutional protections against unreasonable search and seizures as a person in his or her house].)[5]

Defendants place great emphasis on language, which appears in many cases discussing the concept of an inhabited dwelling for purposes of the robbery and burglary statutes, to the effect that a dwelling is a place where one sleeps and maintains one's personal belongings, and has the intent to return. They take the position that a motel room rented for a single night cannot be a dwelling because the occupant has no intent to return. They point out that although Miller intended to spend the night at the Peppertree Motel, he had a permanent home about 30 miles away, and had no intent to return to the motel room after that one night. They rely on *People v. Fleetwood, supra*, 171 Cal.App.3d 982 (hereafter *Fleetwood*), which held that a structure is an inhabited dwelling if "a person with possessory rights uses the place as sleeping quarters *intending to continue doing so in the future*." (*Id.* at p. 987, italics added; see also *People v. Cruz, supra*, 13 Cal.4th at p. 776, quoting *Fleetwood*.)

What defendants fail to recognize—as the court in *Fleetwood* apparently did as well—is that the quoted language is taken out of context. In *Fleetwood*, the motel room was rented by a prostitute who plied her trade there. The defendant contended that the motel room was not an inhabited dwelling, but a place of business. However, the victim had also used the room to sleep in for several weeks and had no other residence, and the court found that the room was therefore an inhabited dwelling. (*Fleetwood, supra*, 171 Cal.App.3d at pp. 986–987.) However, the *Fleetwood* court's concept of

---

[5] The only case we have found from any jurisdiction which holds that a motel room rented for a single night is not an inhabited dwelling is *Robinson v. State* (Miss. 1978) 364 So.2d 1131, 1133–1134. (But see *id.* at p. 1134 (dis. opn. of Robertson, P. J., and Broom, J.).) We respectfully disagree with the court's reasoning and conclusion.

an inhabited dwelling being a place used as sleeping quarters with the intent to continue doing so in the future is derived from *People v. Guthrie* (1983) 144 Cal.App.3d 832 [193 Cal.Rptr. 54] and *People v. Cardona* (1983) 142 Cal.App.3d 481 [191 Cal.Rptr. 109]. (*Fleetwood, supra*, at p. 987.) In those cases, as in the cases they in turn relied upon, the issue is when a dwelling that was once inhabited becomes uninhabited for purposes of the burglary and robbery statutes. As the court explained in *People v. Guthrie*, the burglary and robbery statutes distinguish between "occupied" and "inhabited." A structure is a dwelling if it is ordinarily used for residential purposes. It is "inhabited" if it is currently being used for residential purposes, even if it is temporarily *unoccupied*, i.e., no person is currently present. A formerly inhabited dwelling becomes uninhabited only when its occupants have moved out permanently and do not intend to return to continue or to resume using the structure as a dwelling. (*People v. Guthrie, supra*, at pp. 838–840, citing *People v. Allard* (1929) 99 Cal.App. 591 [279 P. 182]; see also *People v. Cardona, supra*, 142 Cal.App.3d at p. 483; *People v. Hughes, supra*, 27 Cal.4th at pp. 354–355.) Because the victim in *Fleetwood* had not moved out of the motel room, temporarily or otherwise, her intent to continue using the room simply has no bearing on whether the room was inhabited at the time of the robbery.

■ Contrary to defendants' contention, *People v. Cruz, supra*, 13 Cal.4th 764, does not hold that an intent to continue using a dwelling in the future is the sine qua non of habitation. In *People v. Cruz*, the issue was whether an inhabited vessel qualifies as an inhabited dwelling. (*Id.* at p. 768.) It was apparently undisputed that the vessel in question was inhabited, i.e., currently being used as a place of residence. Thus, although the court quoted *Fleetwood*'s definition of habitation, the correctness of the definition was not an issue in that case. A case is not authority for a point that it does not address. (*People v. Alvarez* (2002) 27 Cal.4th 1161, 1176 [119 Cal.Rptr.2d 903, 46 P.3d 372].)

■ Neither *Fleetwood* nor any other case of which we are aware provides any rational basis for making habitation dependent upon the occupant's intention to continue using the structure as a habitation in the future. If the person is using the structure as a habitation when the burglary or robbery occurs, his possible intent to abandon the habitation in the future does not alter its character as an inhabited dwelling. Furthermore, basing the determination of habitation on the occupant's intent to return or to continue using the room as sleeping quarters would have the illogical result that a hotel or motel room rented for two nights would qualify as an inhabited dwelling if the burglary took place on the first day of the rental period, but would not qualify if the burglary took place on the second day of the rental period. And, a room

rented for a single night would not qualify under any circumstances. Interpretations of a statute which would lead to absurd results are to be avoided. (*People v. Loeun* (1997) 17 Cal.4th 1, 9 [69 Cal.Rptr.2d 776, 947 P.2d 1313].) Thus, we hold that a hotel or motel room that is being used for purposes of habitation, regardless of the duration of the habitation, is an inhabited dwelling for purposes of first degree robbery and burglary.

■ Of course, a motel room may be "occupied" for purposes other than use as a temporary dwelling, and thus not be "inhabited" for purposes of the burglary and robbery statutes. (See *People v. Guthrie, supra,* 144 Cal.App.3d at p. 838 [distinguishing between "occupied" and "inhabited"].) As implied in *Fleetwood, supra,* 171 Cal.App.3d 982, a motel room can be rented as a place to transact business, licit or illicit—in that case, prostitution. It is also not uncommon for people to rent motel rooms to conduct legitimate business meetings or transactions. The rooms are "occupied" while these transactions or meetings take place, but they are not "inhabited" unless, as in *Fleetwood,* they are also being used as a place of repose. Here, it was undisputed that Miller intended to stay overnight in the motel room and to sleep there as well as "partying." In light of that evidence, properly instructed jurors could not have failed to conclude that Miller was using the motel as a temporary habitation. Thus, the instructional error was harmless beyond a reasonable doubt. (*People v. Flood, supra,* 18 Cal.4th at p. 504.)

## SUBSTANTIAL EVIDENCE SUPPORTS THE FINDING ON THE GANG ENHANCEMENT AS TO OSIKA

Osika argues that there was insufficient evidence to prove beyond a reasonable doubt that she had the "specific intent to promote, further, or assist in any criminal conduct by gang members . . . ." within the meaning of section 186.22, subdivision (b)(1).

" ' "When the sufficiency of the evidence is challenged on appeal, the court must review the whole record in the light most favorable to the judgment to determine whether it contains substantial evidence—i.e., evidence that is credible and of solid value—from which a rational trier of fact could have found the defendant guilty beyond a reasonable doubt." ' [Citations.]" (*People v. Hill* (1998) 17 Cal.4th 800, 848–849 [72 Cal.Rptr.2d 656, 952 P.2d 673].) We resolve all conflicts in favor of the judgment and indulge all reasonable inferences from the evidence in support of the judgment. (*Bickel v. City of Piedmont* (1997) 16 Cal.4th 1040, 1053 [68 Cal.Rptr.2d 758, 946 P.2d 427].) This standard applies to convictions resting primarily on circumstantial evidence (*People v. Perez* (1992) 2 Cal.4th 1117, 1124 [9 Cal.Rptr.2d 577,

831 P.2d 1159]), and to gang enhancement findings (*People v. Ortiz* (1997) 57 Cal.App.4th 480, 484 [67 Cal.Rptr.2d 126]).

 A gang enhancement does not apply unless the crime was "committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members . . . ." (§ 186.22, subd. (b)(1).) Osika concedes that there was sufficient evidence to prove the first prong of section 186.22, subdivision (b)(1); we agree. Her contention is that there was insufficient evidence to support the jury's finding on the second prong, i.e., that she acted "with the *specific intent* to promote, further, or assist in any criminal conduct by gang members . . . ." (§ 186.22, subd. (b)(1), italics added.)

 As to the second prong of the enhancement, all that is required is a specific intent "to promote, further, or assist in any criminal conduct by gang members." (§ 186.22, subd. (b)(1).) Commission of a crime in concert with known gang members is substantial evidence which supports the inference that the defendant acted with the specific intent to promote, further or assist gang members in the commission of the crime. (*People v. Morales* (2003) 112 Cal.App.4th 1176, 1198 [5 Cal.Rptr.3d 615].)

Here, Villalobos was an admitted and active member of OVS at the time of the charged offenses, and there is substantial evidence from which jurors could infer that Osika was aware of his gang affiliation. Miller testified that when he saw the two men standing outside the motel room and said he did not know them, Osika said, "Oh, that's my boyfriend." It was not clear whether she was referring to Villalobos or the other man, but in the absence of clarification by the defense, jurors could infer that she was referring to Villalobos. Officer Volm, who was acquainted with both defendants, testified that to his knowledge Villalobos and Osika had been boyfriend and girlfriend for some time prior to the date of the crimes.[6] Volm also testified that Villalobos has "OVS" tattooed in "very large letters" on the back of his head, and that before the trial, he wore his hair very short or shaved. He also had "SS Onterio" tattooed on the back of his neck. It was therefore reasonably inferable that Osika knew that Villalobos was an OVS gang member. Osika does not challenge the sufficiency of the evidence that she acted in concert with Villalobos in the commission of burglary, robbery, false imprisonment and car theft. Thus, Osika's "intentional acts, when combined with [her] knowledge that those acts would assist crimes by . . . gang members, afforded sufficient evidence of the requisite specific intent." (*People v. Morales, supra*, 112 Cal.App.4th at pp. 1198–1199.)

---

[6] Osika testified before Villalobos's jury only that Villalobos was her fiancé.

## DISPOSITION

The judgments are affirmed as to both defendants.

Ramirez, P. J., and Miller, J., concurred.

Appellants' petition for review by the Supreme Court was denied March 21, 2007, S149363.