Filed 10/23/13  In re T.C. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re T.C., a Person Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E057399 |
| Plaintiff and Respondent, | (Super.Ct.No. J243722) |
| v. | OPINION |
| S.C., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Christopher B. Marshall, Judge.  Reversed.

William D. Caldwell, under appointment by the Court of Appeal, for Defendant and Appellant.

Jean-Rene Basle, County Counsel, Danielle E. Wuchenich, Deputy County Counsel, for Plaintiff and Respondent.

1

S.C. appeals a juvenile court order dismissing a dependency petition and giving legal and physical custody of her daughter, T.C., to the child's father. She contends that the evidence was insufficient to support the court's exercise of jurisdiction.

We agree, and we will reverse the judgment.

FACTUAL AND PROCEDURAL HISTORY

On April 11, 2012, S.C. (hereafter mother) took her three-year-old daughter, T.C., to her pediatrician because she believed the child had been sexually molested. The doctor saw no evidence of sexual abuse, but referred mother to Arrowhead Regional Medical Center, which then referred her to Loma Linda University Medical Center for a rape examination. The pediatrician at Loma Linda found no evidence of sexual abuse. Mother told the doctor that for two years, someone would enter her home during the night, drug her and rape T.C. She believed that someone had installed cameras in her home and was watching her. The pediatrician believed that mother might pose a threat to herself or to her daughter's safety. He called the sheriff's department and asked them to initiate a psychiatric hold.

Mother was detained pursuant to Welfare and Institutions Code section 5150,[1] but was released after six hours because within that short period she had become "coherent and appropriate." A social worker for San Bernardino County Children and Family

_____

[1] Welfare and Institutions Code section 5150, subdivision (a) permits a person to be involuntarily held in a psychiatric facility for up to 72 hours for evaluation and treatment if the person is a danger to him- or herself or to others or is gravely disabled as a result of a mental disorder.

All further statutory citations refer to the Welfare and Institutions Code unless another code is specified.

2

Services (CFS) attempted to reach the maternal step-grandmother but was unable to reach her. T.C. told her that her grandmother was on vacation and would not be at home. Mother told the social worker the name of T.C.'s father, J.C. (hereafter sometimes referred to as father), and told her that he lived in Minnesota, but the social worker was unable to reach him.

T.C. was placed in a foster home, and a dependency petition pursuant to section 300 was filed, alleging that mother's mental health issue limited her ability to provide adequate care and supervision and that her 5150 status left the child with no means of support. The petition also alleged that T.C.'s father had failed to maintain an appropriate relationship with the child for the past three years and that because his location was unknown, his ability and willingness to provide adequate care and supervision were unknown.

At the detention hearing, mother told the court that T.C.'s father was her ex-husband. She stated that they had been awarded joint custody by the court in Kentucky, where they lived when they divorced. She did not have access to his address or telephone number at that time, but she agreed to provide the information to CFS as soon as possible. Visitation and reunification services were ordered for both parents.

At some point between the filing of the petition and May 1, 2012, the date the jurisdiction/disposition report was filed, T.C. was placed with her maternal grandparents, i.e., mother's father and her stepmother. The social worker described T.C. as a "happy, social child who has exceptional verbal skills for her age," and "a bright child with good skills for her age." She was in preschool and was healthy with no known medical,

3

behavioral or emotional concerns. She was accustomed to spending time with her grandparents in their home as they cared for her after preschool while her mother attended school. The grandparents loved her very much and appeared to have a good understanding of her best interest. The grandparents were willing to provide a permanent home for T.C. if that became necessary.

CFS contacted father after the detention hearing. The jurisdiction/disposition report stated that T.C.'s parents had met and married while both were in the Army. After they divorced and both had been discharged from the Army, father had lived near T.C. and her mother for a time, but was unable to find satisfactory employment and moved back to Minnesota, where his parents lived. He paid $450 a month in child support, although he was ordered to pay only $200 a month. He and T.C. spoke frequently via Skype. He had visited T.C. in California twice, and T.C. had spent five weeks visiting him in Minnesota during the summer of 2011. For these reasons, CFS recommended finding the allegations that father had failed to support T.C. and failed to maintain an appropriate relationship with her not true. Prior to the jurisdiction hearing, father had taken two parenting classes. He wanted full custody of T.C.

The jurisdiction/disposition report described mother as in most ways a very competent, loving mother who was committed to her daughter and had provided and cared for her to the best of her ability. Mother had been mentally stable since the date of the visit to Loma Linda University Medical Center, although she denied having told anyone that an unknown person had entered her home, drugged her and raped T.C. The social worker held the opinion that mother knew she had had an incident in which she

4

was paranoid and delusional but did not know what had caused it and so chose to deny it. The social worker noted that even in her delusional state, mother was trying to do what was best for T.C. However, the social worker expressed concern that mother's delusions would cause T.C. emotional harm, in that her irrational fears concerning men could cause T.C. to grow up fearful of men and of the world in general.

Mother had been sexually abused as young girl, and she admitted that she was hypervigilant about protecting T.C. She did not allow T.C. to be around men other than her father, would not put her in a day care center that had male employees, and would not leave her with anyone but her father.[2]

T.C.'s father reported that mother's delusions and paranoia were present when they were married. She would cover ceilings, vents, television speakers and electrical sockets because she was convinced there were cameras in them. She talked about the cameras all the time and tried to convince him of the risk that someone might be watching them. Although she wanted father to care for T.C., she never fully trusted him and used a video baby monitor to watch him while he was caring for T.C.

Dr. Kinsman conducted a psychological evaluation of mother for the dependency proceedings. Mother informed him that as a child, she was sexually molested by her stepfather, her stepfather's brother, a friend of her father, and a neighbor. Dr. Kinsman stated that mother's false beliefs that T.C. had been raped may have had its origin in

---

[2] It is not clear whether the "father" referred to in this part of the report was T.C.'s father or mother's father. Mother routinely left T.C. in the care of her father and his wife, and also allowed T.C. to visit T.C.'s father.

5

mother's own childhood experiences. The full extent of her "hypervigilant concern" only emerged when she sought medical help for harm she delusionally believed was inflicted on T.C. She was "desperately anxious" to protect T.C. from the kind of abuse she had experienced. Dr. Kinsman stated that although there was no indication that mother directly presented a threat to T.C.'s safety, her "internal preoccupation with delusional beliefs that she and her daughter are being persecuted and physically harmed may interfere with her ability to safely and effectively parent her child." He concluded that mother suffered from delusional disorder, persecutory type, adjustment disorder with mixed anxiety, and depressed mood. He recommended that she obtain individual psychotherapy and be evaluated by a psychiatrist to determine whether medication might relieve some of the distress she was then experiencing.

Mother did enter into individual counseling and made an appointment with a psychiatrist at the Veterans Administration. By the date of the jurisdiction/disposition hearing, mother had had nine counseling sessions. The counselor expressed concerns about mother's "sense of reality."

Both parents appeared at the jurisdiction/disposition hearing. Both asked to set the hearing contested, but both requested that the case be referred to mediation as well. The court set the matter for a contested hearing following mediation. It authorized CFS to allow an extended visit between T.C. and her father in Minnesota and unsupervised visits with father while he was present in California.

Following the initial mediation session on June 7, 2012, T.C. went to Minnesota for an extended visit with father. The social worker visited the home during the visit and

observed that T.C. and father had a "healthy, loving and supportive relationship" and that they responded to each other well and listened to and respected each other. Father lived with his parents, and T.C. had a positive relationship with the grandparents as well. The paternal grandmother was willing and able to care for T.C. while father was at work or in school. (Father was employed nearly full time and was studying for a bachelor's degree in information technology.)

On August 30, 2012, the parents engaged in further mediation and agreed that T.C. would live with father. They agreed to a visitation schedule. Mother was unwilling to give up legal custody, however, and they left that issue unresolved.

At the jurisdiction hearing, the court dismissed all allegations of the petition except a single allegation based on section 300, subdivision (b), specifically that mother "has [a] mental health issue which limits her ability to provide adequate care and supervision of [T.C] while in her care and custody." The court found that allegation true, and found that T.C. was a dependent child within the meaning of section 300. The court adopted the parents' agreement with respect to visitation but placed legal and physical custody solely with father. The court terminated jurisdiction and dismissed the petition.

## DISCUSSION

### THE EVIDENCE DOES NOT SUPPORT THE JURISDICTIONAL FINDINGS AS A MATTER OF LAW

Mother contends that because there was no substantial evidence that she posed any substantial risk to her daughter's physical well-being as of the date of the jurisdiction

7

hearing, the court erred in finding that T.C. came within the definition of a dependent child pursuant to section 300, subdivision (b).  We agree.

*Standard of Review*

Although mother couches her argument in terms of the substantial evidence rule, which is deferential to the trial court's findings (see, e.g., *In re James R.* (2009) 176 Cal.App.4th 129, 134-135), her argument is more accurately viewed as a contention that the undisputed evidence does not support a finding under section 300, subdivision (b) as a matter of law because there was no evidence that mother's mental health issue caused serious physical harm to T.C. or placed T.C. at substantial risk of serious physical harm. That is a legal question which we decide de novo.  (*People v. Villalobos* (2006) 145 Cal.App.4th 310, 316, fn. 3 [Fourth Dist., Div. Two].)

*Section 300, Subdivision (b)*

The court dismissed all allegations of the petition except a single allegation based on section 300, subdivision (b), specifically that mother "has [a] mental health issue which limits her ability to provide adequate care and supervision of [T.C] while in her care and custody."  Section 300, subdivision (b) allows a court to exercise dependency jurisdiction where it is proven by a preponderance of the evidence (see § 355, subd. (a)) that the child "has suffered, or there is a substantial risk that the child will suffer, *serious physical harm or illness*" due to the parent's failure or inability to adequately supervise or protect the child.  (Italics added.)  Evidence that a parent suffers from delusions does not support jurisdiction under section 300, subdivision (b) unless there is substantial evidence that parent has inflicted serious injury on the child as a result of the delusions or that the

8

child is at serious risk of such injury because of the parent's delusions. (*In re Matthew S.* (1996) 41 Cal.App.4th 1311, 1319.)

In *Matthew S.*, *supra*, 41 Cal.App.4th 1311, the appellate court held that the minor had not suffered serious physical harm and was not at risk of such harm as a result of his mother's delusions, where the mother had taken her 13-year-old son to a urologist for an examination based on her delusional belief that his penis had been mutilated. There was no injury to the minor's genitals, nor any other injury or sign of neglect, and there was no evidence which could support the inference that the minor was at risk of any physical harm resulting from his mother's delusional thinking. Consequently, the court held, the social services agency did not meet its burden of proof under section 300, subdivision (b). (*Id.* at pp. 1314-1317, 1319.)

Here, there is likewise no evidence that mother's delusions ever caused T.C. *any* physical harm, let alone serious physical injury or illness, or placed her at substantial risk for such harm. On the contrary, the reports prepared by CFS state that T.C. is a healthy, happy child, and the reports do not reflect that she displayed any signs of injury or neglect. On appeal, the only concern for T.C.'s physical well-being CFS can point to is that when mother believed that T.C. had been raped, it took her a week to take T.C. to the doctor. CFS asks, "If it took mother a week to take [T.C.] to the doctor after such a traumatic and dangerous 'attack,' what would mother do in 'less serious' situations?" This is, of course, pure speculation, as there is no evidence that mother had ever hesitated to obtain treatment for her daughter when it actually was medically necessary.

9

The reports also do not contain any factual basis for concluding that mother's mental health created a substantial risk of serious physical harm in the future. The issue in this case was always whether T.C. was at risk of emotional harm because of her mother's delusions and her exaggerated fear of men. Serious emotional harm or the substantial risk of such harm may warrant dependency jurisdiction, under section 300, subdivision (c). (See *In re Matthew S.*, *supra*, 41 Cal.App.4th at pp. 1320-1321.) However, subdivision (c) was not alleged in this case as a basis for jurisdiction.

The social services agency has the burden of showing specifically how a minor has been or will be harmed, and harm or risk of harm may not be presumed from the mere fact that the parent suffers from a mental illness. (*In re Matthew S.*, *supra*, 41 Cal.App.4th at p. 1318.) CFS did not meet that burden in this case with respect to the allegation under section 300, subdivision (b). Accordingly, because the allegation under subdivision (b) was the sole basis for the court's exercise of dependency jurisdiction, the judgment must be reversed.

DISPOSITION

The judgment is reversed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

McKINSTER_____
Acting P. J.

We concur:

MILLER_____
J.

CODRINGTON_____
J.

10