Filed 11/25/13  P. v. Lout CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>JOSEPH DANIEL LOUT,<br><br>    Defendant and Appellant. | F064129<br><br>(Super. Ct. Nos. BF136097B & BF138306A)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  Kenneth C. Twisselman II and Colette M. Humphrey, Judges.[*]

Eleanor M. Kraft, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Charles A. French and Caely E. Fallini, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

[*]    Judge Twisselman presided in case No. BF136097B; Judge Humphrey presided in case No. BF138306A.

In Kern County Superior Court case No. BF136097B, a jury convicted defendant Joseph Daniel Lout of first degree burglary.  (Pen. Code, § 460, subd. (a); count 1.)[1] Following a bifurcated court trial, defendant was found to have suffered a prior conviction under the "Three Strikes" law (§§ 667, subds. (c)-(j), 1170.12, subds. (a)-(e)), and to have served two prior prison terms (§ 667.5, subd. (b)).  His request to dismiss his prior strike conviction was denied, and he was sentenced to a total of 15 years in prison, and ordered to pay various fees, fines, and assessments.[2]

In Kern County Superior Court case No. BF138306A, defendant was charged by complaint with 23 felony offenses committed while he was on bail (§ 12022.1) in case No. BF136097B.  The complaint further alleged defendant had suffered a prior strike conviction and served three prior prison terms.  He subsequently pleaded nolo contendere to counts 4 (forgery; § 470, subd. (d)), 12 (second degree burglary; § 460, subd. (b)), and 23 (possession of a firearm by a felon; former § 12021, subd. (a)(1)), and admitted the prior strike conviction, on condition that the remaining charges and allegations would be dismissed and he would receive a four-year term that would be served consecutively to

---

[1]     All statutory references are to the Penal Code unless otherwise stated.

Defendant was charged, in count 2, with second degree burglary.  (§ 460, subd. (b).)  Jurors were instructed that this was an alternative to count 1.  They made no finding thereon, and the charge was dismissed.

The clerk's minutes of October 21, 2011, and November 29, 2011, the court's pronouncement of sentence, and the abstract of judgment erroneously show defendant was convicted of first degree burglary in count 2, rather than count 1 as reflected in the verdict.

[2]     Defendant's sentence included a five-year term imposed pursuant to section 667, subdivision (a), despite the fact such an enhancement was not alleged in the amended information or found true during the court trial.

his sentence in case No. BF136097B. Defendant was sentenced in accord with the terms of the plea bargain.[3]

Defendant challenges his conviction for first degree burglary on various grounds. We hold that a determination by a municipality that a structure is unfit for occupancy does not, in and of itself, preclude a first degree burglary conviction. First degree burglary is an offense against habitation, not an offense against legal habitability.

We further hold, however, that the evidence was insufficient to establish the house was an inhabited dwelling. The house had not been lived in on a fulltime basis for several years, the owner did not consider it to be "livable" and, although the owner intended to move back into the house at some point several years into the future, at the time of defendant's entry, the house was merely a storage facility for some of the owner's belongings.

We reject defendant's assertion the evidence was insufficient to establish he entered the house with the intent to commit larceny or any felony. We find the burglary occurred and was of the second degree. We modify the conviction accordingly and remand the matter to the trial court for resentencing.

## FACTS

### I

#### PROSECUTION EVIDENCE

Around noon on March 20, 2011, Bakersfield Police Officer Guinn was dispatched to a house in the 6100 block of Quaking Aspen in response to a call regarding suspicious activity. When he arrived, he observed a white Mitsubishi parked directly across the street from the house.

---

[3] Defendant does not challenge the plea or sentence in case No. BF138306A. Accordingly, we dispense with any further discussion of that case.

Guinn and Officer Wimberly, who arrived shortly after, walked to the front of the residence. On the front door, Guinn observed a large yellow sticker placed by Bakersfield Code Enforcement, warning it was a misdemeanor to occupy the house because it was unsafe. Just north of the front door was a window; a screen was on the ground immediately below it and the window was open approximately four or five inches.

Guinn pushed the window all the way open, stuck his head in, and yelled that they were from the Bakersfield Police Department and that anyone inside was to make themselves known. He made this announcement twice, but got no response. Guinn then entered through the window. A puppy came running up from inside the house, and Guinn observed the first subject, subsequently identified as Zach Olsen, in the main family area. Guinn asked if there was anyone else inside the residence; Olsen said he did not know.

Guinn heard a sound coming from the hallway that led to the garage. He illuminated the area with his flashlight, and observed defendant in the hallway. The door from the hallway into the garage was open. Defendant was wearing heavy-duty mechanic-type gloves. Guinn had investigated approximately 100 burglaries, with puppies involved in perhaps three of them. In some, he had happened upon the perpetrators when responding to the location. The suspects who wore gloves told him they did so to conceal their fingerprints. Based on his training and experience, Guinn believed defendant's gloves were used for that purpose.[4] In Guinn's experience, there were houses in Bakersfield that had been abandoned and in which people ("squatters") stayed for several days, drinking and doing drugs. This particular house contained more property than houses in which Guinn typically saw squatters.

---

**4** Olsen was not wearing gloves.

Officer Mears assisted Guinn and Wimberly at the scene. The house was in Mears's patrol area. Mears had never seen anyone living in it. The grass in the yard was tall.

Defendant and Olsen were placed in the back of Mears's patrol car, which was equipped with a recording device. A conversation between the two was recorded; defendant stated, "I thought that was your homeboys," and "I'm fucking pissed. Fucking, he's the one that told me to go over there. I would have, fucking, I didn't want to do it today. I fucking wish I would have never laid eyes on that freaking stupid ass."

Mears had, like Guinn, investigated a number of burglaries. He had spoken to individuals who were caught in the process of burglarizing a home, and who were wearing gloves; those individuals said they wore gloves in order not to leave fingerprints. Mears saw the gloves defendant was wearing; he had seen gloves like that on individuals who committed burglaries.

Javier Robledo was the owner of the house, which he purchased in 1990. He and his family had lived in Inglewood since 1978, but wanted to move out of Los Angeles. He, his brother, and his mother moved into the house together. His mother died six or seven years before trial. His brother, the last one to live at the house, moved back to Los Angeles at least three or four years before trial. The house was left pretty much the way it was when Robledo's mother was living there, with furniture, kitchen appliances, beds, and clothing remaining inside.

As of the time of trial, Robledo lived in Inglewood and worked in El Segundo. His job was in the Los Angeles area and he got tired of living in Bakersfield and commuting to work, so he stayed in Inglewood during the week. Robledo tried to come back to the Bakersfield house every weekend, but it was more difficult now that things were "all messed up." He no longer came as often because he could not stay at the house. There was no place to sleep. The last time Robledo checked, there was no clothing at the house. Someone had broken in and "pretty much took everything." When Robledo left

5.

the house on weekends, the front door was locked. He secured what he could to make it safe so no one could get in, but one or two of the windows were broken.

As of March 20, 2011, Robledo knew the water to still be connected at the house. He customarily paid the water bill a year at a time, and had just received a bill prior to trial. He normally tried to pay for the electricity six months at a time, but was unable to make payments when he came on the weekends because the offices were closed. He believed the electricity was no longer connected. Because he could not really use the house, he was coming once a month to check on it. He usually just went in and walked around to see if any damage had been done. He had a friend cut the grass, but when he saw the property the last time, it appeared the grass had not been cut.

Robledo planned to make the Bakersfield house his retirement location once he retired from work. He was almost 57 years old at the time of trial and the legal retirement age was 67, although he hoped to retire early, within five to six years. His intent at the time of trial was to secure the surroundings first, put bars on the windows, and slowly fix up the things that got damaged, so that he could live in the house at least on weekends. That was always his intent, even when he stopped coming every weekend.

Robledo was aware of a yellow sticker on the door of the house, but he never read it. Normally, he would arrive late in the afternoon, then just walk around and leave. He did not stay inside the house because it was not livable. In November 2010, he received, at his Inglewood address, a letter from the City of Bakersfield, saying he was "in violation" and that they had done some work on the outside of the house. He paid them for the services they provided. There was also a letter dated July 2010, but Robledo never received it. The July 2010 letter was sent to the Quaking Aspen address. Although Robledo was still receiving mail there, the postal worker would not leave mail once the mailbox was full.

The first time Robledo discovered that people apparently were going into the residence and taking things was on November 8, 2010, the day he paid the City of

6.

Bakersfield for its services. He never prepared a meal in the house after that date, because everything had been taken away. The last time he slept in the house was also before that date.

## II

### DEFENSE EVIDENCE

Mark Turk was a code enforcement officer for the City of Bakersfield. He was familiar with the Quaking Aspen property. In 2010, the house was vacant and in a state that rendered it a nuisance, in violation of the Bakersfield Municipal Code. An initial inspection was made on May 27, 2010, and a first notice sent. Because the condition was not corrected by the time of reinspection, a second notice was sent. The City then hired a contractor to clean the property to correct the public nuisance. It was abated by the contractor on September 15, 2010.[5] The case was closed on September 17, 2010, and Turk was unaware of any current action being taken with regard to the property.[6] On October 15, 2010, a notice was sent to the property owner that fees were being filed against the property as a tax lien. The October letter was sent to the address listed on the tax assessor's rolls, which was in Inglewood.

When a house is vacant and does not have utilities, it is common practice to post a sticker on the door stating the house is not to be entered. A notice of that type was posted on the Quaking Aspen residence. This gives police recourse to cite or arrest vagrants or vandals caught trespassing in the structure. If the owner wants to rehabilitate the place or

---

[5] Abatement involved removing overgrown or dead vegetation, lifting up the foliage so there was a clear view of the property in front with no hidden windows, pumping stagnant water out of the swimming pool, and making sure all doors and windows were secured.

[6] Turk was working in another part of town at the time he testified, so he personally did not have any knowledge of other open cases with regard to this property. If the sticker was still on the door at the time of trial, this would mean the property had not "been made."

make it habitable again, he or she is allowed to go in during daylight hours, but must first notify the department. The house cannot be occupied after dark, however. In addition, utilities (meaning a lawful heat source, hot and cold running water, and electricity) must be restored before the owner is allowed to inhabit the house. To Turk's knowledge, one of the reasons the sticker went on the door at this location was because there were no utilities there.

Turk had seen numerous vacant, abandoned houses during the course of his present employment. He found them in various stages, so it was not rare to find houses that had piles of belongings inside.

## DISCUSSION

Defendant contends his conviction for first degree burglary cannot stand because the Quaking Aspen house did not constitute an "inhabited dwelling house" within the meaning of the foregoing statutes.

"Every person who enters any house … with intent to commit grand or petit larceny or any felony is guilty of burglary." (§ 459.) Burglary of an inhabited dwelling house constitutes first degree burglary, while all other kinds of burglary are of the second degree. (§ 460, subds. (a) & (b).) "'[I]nhabited' means currently being used for dwelling purposes, whether occupied or not." (§ 459.)

Where the evidence is undisputed, its legal sufficiency to support a conviction is a question of law that we review de novo. (*People v. Villalobos* (2006) 145 Cal.App.4th 310, 316, fn. 3.) In all other situations, the test of sufficiency of the evidence is whether, reviewing the whole record in the light most favorable to the judgment below, substantial evidence is disclosed such that a reasonable trier of fact could find the essential elements of the crime beyond a reasonable doubt. (*People v. Johnson* (1980) 26 Cal.3d 557, 578; accord, *Jackson v. Virginia* (1979) 443 U.S. 307, 319.) Substantial evidence is that evidence which is "reasonable, credible, and of solid value." (*People v. Johnson*, *supra*, at p. 578.) An appellate court must "presume in support of the judgment the existence of

8.

every fact the trier could reasonably deduce from the evidence." (*People v. Reilly* (1970) 3 Cal.3d 421, 425.) An appellate court must not reweigh the evidence (*People v. Culver* (1973) 10 Cal.3d 542, 548), reappraise the credibility of the witnesses, or resolve factual conflicts, as these are functions reserved for the trier of fact (*In re Frederick G.* (1979) 96 Cal.App.3d 353, 367). This standard of review is applicable regardless of whether the prosecution relies primarily on direct or on circumstantial evidence. (*People v. Lenart* (2004) 32 Cal.4th 1107, 1125.)

Defendant first says his conviction for first degree burglary cannot stand because the house at issue was not legally inhabitable. It is undisputed that the Quaking Aspen structure could not legally be occupied. (Bakersfield Mun. Code, § 8.80.060.) However, the plain language of section 459 contains no requirement of legal habitability.

Nor do we find such a requirement in the legislative intent underlying the burglary statutes. First degree burglary is "a serious crime meant to protect important societal policies. [Citations.]" (*People v. DeRouen* (1995) 38 Cal.App.4th 86, 91 (*DeRouen*), disapproved on another ground in *People v. Allen* (1999) 21 Cal.4th 846, 864-866 & fn. 21.) "'Cases interpreting the term "inhabited dwelling house" in section 460 … ha[ve] made it clear that this term should be construed to effectuate the legislative purposes underlying the statute, namely, to protect the peaceful occupation of one's residence." (*People v. Rodriguez* (2000) 77 Cal.App.4th 1101, 1106.) "California's burglary law 'stems from the common law policy of providing heightened protection to the residence. [Citations.]' [Citation.] At common law, burglary was considered 'an offense against habitation rather than against property. The peace of mind and security of the residents was sought to be protected, rather than the property.' [Citation.]" (*People v. Villalobos, supra,* 145 Cal.App.4th at p. 317.) "'"Burglary laws are based primarily upon a recognition of the dangers to personal safety created by the usual burglary situation — the danger that the intruder will harm the occupants in attempting to perpetrate the intended crime or to escape and the danger that the occupants will in anger

or panic react violently to the invasion, thereby inviting more violence."' [Citation.] 'In addition, a burglary of an inhabited dwelling involves an invasion of perhaps the most secret zone of privacy, the place where trinkets, mementos, heirlooms, and the other stuff of personal history are kept. Society therefore has an important interest in seeing to it that burglars stay out of inhabited dwelling houses.' [Citation.]" (*DeRouen, supra,* 38 Cal.App.4th at p. 91.)

"In keeping with the purpose of the statute, the term '"inhabited dwelling house"' has been given a 'broad, inclusive definition.' [Citation.]" (*People v. Villalobos, supra,* 145 Cal.App.4th at p. 317.) The purpose of the statute would not be served by excluding from its protection a residence that is factually inhabited but illegally so. (See *People v. Rojos* (1995) 31 Cal.App.4th 611, 614-615 [occupant need not have possessory right to premises to render residence "inhabited dwelling house"; dispute over right to occupy premises, even if a matter for law enforcement, makes no difference as far as application of burglary statutes].)

*People v. Aguilar* (2010) 181 Cal.App.4th 966 (*Aguilar*), on which defendant relies, does not alter our conclusion. In that case, the defendant was found inside the victim's apartment after the victim and other residents of an apartment building were temporarily relocated to a hotel because of a fire in one of the units, but before the victim was notified by apartment management that he would be unable to move back into his apartment and would need to be transferred to another unit in the same apartment complex. On appeal, the defendant claimed he could not be convicted of first degree burglary because the evidence showed the victim's apartment was not inhabited at the time of the burglary, because it was so damaged that it was no longer usable as a residence and the victim was not permitted to return there to live. (*Id.* at pp. 968-969.) The Court of Appeal concluded the argument "must be rejected because it does not focus on the point of view of the victim at the time the burglary occurred." (*Id.* at p. 971.) The court upheld the exclusion, as irrelevant, of testimony from a city building inspector who

examined the apartment building on the date of the fire and determined the building was uninhabitable, because, habitability being determined based on the point of view of the victim, "the technical status of the apartment building under applicable building codes and regulations was not relevant to whether the victim's apartment was 'inhabited' within the meaning of section 459 at the time of the burglary." (*Id*. at pp. 972-973.) Since there was no evidence suggesting the victim was aware of the building inspector's opinion, that opinion "could not have had any effect on the habitability of the apartment from the victim's point of view at the time of the burglary .…" (*Id*. at p. 973.)

*Aguilar* does not engraft a "legally habitable" requirement onto section 459. Whether a person is legally permitted to live somewhere is not the same question as whether, from that person's point of view, the location is used as a residence. In the present case, there was some question whether Robledo actually knew the Quaking Aspen house had been deemed legally uninhabitable. Defendant was permitted to present evidence on this issue and its effect on Robledo's point of view. *Aguilar* does not entitle him to more.

Nevertheless, we agree with defendant that, under the specific facts of this case, the house was not "inhabited." Accordingly, defendant's conviction for first degree burglary cannot stand.

As we previously observed, section 459 defines "inhabited" as "currently being used for dwelling purposes, whether occupied or not." In *People v. Rodriguez* (2004) 122 Cal.App.4th 121, 132, the court compiled a number of authorities on when a structure is "inhabited":

> "For purposes of the California first degree burglary statute, a structure 'need not be occupied at the time [of entry]; it is inhabited if someone lives there, even though the person is temporarily absent.' (2 Witkin & Epstein, Cal. Criminal Law[ (3d ed. 2000)] Crimes Against Property, § 114, p. 144; see *People v. Hughes* (2002) 27 Cal.4th 287, 354-355 [apartment was inhabited even though occupant was in process of moving; her furnishings remained there, and she was present in apartment

during daytime hours]; *People v. Hernandez* (1992) 9 Cal.App.4th 438 [apartment was inhabited when tenants moved all of their belongings into it, but had not yet slept in it or unpacked]; *People v. Jackson* (1992) 6 Cal.App.4th 1185 [dwelling continued to be inhabited because tenant who intended to move out had not vacated premises and was still using the house at time of robbery]; *People v. Marquez* (1983) 143 Cal.App.3d 797, 800, 802 [house inhabited even though resident, under conservatorship, had been absent for two and a half years, because resident intended to return]; CALJIC No. 14.52 ['[an inhabited dwelling house] is inhabited although the occupants are temporarily absent'].)  A structure that was once used for dwelling purposes is no longer inhabited when its occupants permanently cease using it as living quarters, and no other person is using it as living quarters.  (*People v. Cardona* (1983) 142 Cal.App.3d 481, 483 [house no longer inhabited when residents had moved and no identifiable person was currently using it as sleeping quarters][7]; *People v. Valdez* (1962) 203 Cal.App.2d 559 [house not inhabited when previous tenant had moved out a week earlier and new tenant had not moved any belongings into house].)"

In the present case, the evidence showed the Quaking Aspen house had not been lived in on a fulltime basis for several years, since Robledo's brother moved out.  It remained fully furnished, however, and Robledo had lived there on weekends for a while.

At the time defendant entered the house, however, this situation no longer existed. Robledo — by his own testimony — could not "really use the house," he was only coming about once a month to check on it by walking around to see if any damage had been done.  This situation had existed since at least June 2010, well before the date of the offense.  Although the water was connected, it did not appear the electricity was turned on.  Mail was still being delivered to the house, but not once the mailbox was full. Robledo last prepared a meal and slept in the house prior to November 8, 2010, again well before the date of the offense.  It was Robledo's stated intent to make the house his retirement home, but his anticipated retirement date was several years into the future.

---

**7**     Because statutory amendments have eliminated the requirement that a burglary occur at night in order for it to be first degree burglary, the use of a house as sleeping quarters remains a circumstance to be taken into consideration, but is no longer determinative.  (*People v. Hughes, supra,* 27 Cal.4th at pp. 354-355.)

Moreover, Robledo acknowledged he would have to fix the damage in order to be able to live in the house on weekends. Despite the fact he was aware of things being stolen and windows being broken, he had not taken steps to secure the residence other than locking the front door. In his words, he "[didn't] stay there because [it was] not livable."**[8]**

The Quaking Aspen structure clearly was not an abandoned dwelling. Neither, however, was it an inhabited one. "The "'"inhabited-uninhabited' dichotomy turns not on the immediate presence or absence of some person but rather on the character of the use of the building."'" [Citation.] '[T]he proper question is whether *the nature of a structure's composition* is such that a reasonable person would expect some protection from unauthorized intrusion.' [Citation.]" (*DeRouen, supra,* 38 Cal.App.4th at pp. 91-92.)**[9]** "Thus, a temporary place of abode, such as a weekend fishing retreat [citation], a hospital room [citation] or even a jail cell [citation], may qualify [as an inhabited dwelling]." (*People v. Villalobos, supra,* 145 Cal.App.4th at p. 318.)

Here, Robledo himself considered the house unlivable, as would any reasonable person. His plan to fix it up and someday return was nebulous. In the meantime, the premises had deteriorated to the point they were declared legally uninhabitable. (Compare *People v. Marquez, supra,* 143 Cal.App.3d at pp. 799-800, 801-802 [house

---

**[8]** Photographs taken inside the house were admitted at trial and are contained in the record on appeal. They confirm Robledo's assessment.

**[9]** The source of the second sentence quoted in *DeRouen* is *People v. Brown* (1992) 6 Cal.App.4th 1489, 1496. The issue in *Brown* was whether entry onto an unenclosed front porch constituted entry into a residence so as to warrant a jury instruction, based on section 198.5, concerning an occupant's use of deadly force against an intruder. (*Brown*, *supra*, at p. 1495.) *Brown* in turn relied primarily on *People v. Nible* (1988) 200 Cal.App.3d 838, in which the issue was whether penetration of a window screen, but not the window itself, constituted burglary. (*Id*. at p. 841.) Although it would seem the *DeRouen* court took the quotation out of context, the California Supreme Court has quoted that portion of *DeRouen* with approval in the context of determining whether an apartment constituted an inhabited dwelling within the meaning of the burglary statutes. (See *People v. Hughes, supra,* 27 Cal.4th at p. 355.)

13.

was "inhabited dwelling" where resident had moved to boarding home under conservatorship; despite the fact she had not lived in house in more than two years and there was doubt she would return, the house was furnished, entered every day, and maintained].) Even from the victim's perspective, the building was not "serving as the functional equivalent of a home away from home." (*People v. Long* (2010) 189 Cal.App.4th 826, 837.)

Additionally, although a victim's intent to return and inhabit a dwelling in the future is important (*Aguilar*, *supra*, 181 Cal.App.4th at p. 970), and "[i]t is the intent and not the length of absence which controls" (*People v. Marquez, supra,* 143 Cal.App.3d at p. 802), no single factor is dispositive of whether a structure is an inhabited dwelling (see *People v. Villalobos, supra,* 145 Cal.App.4th at p. 320). Rather, the totality of the circumstances must be considered. (See *People v. Hernandez, supra,* 9 Cal.App.4th at p. 441.)

Whatever Robledo's future plans, at the time of defendant's entry, the house was not an inhabited dwelling, but merely a storage facility for some of the Robledo family's belongings. In such circumstances, a reasonable person might *hope* those belongings would go unmolested. There do not exist, however, "the peculiar risks of violence and resulting injury which inhere in the burglary of a home" — the risks upon which the Legislature's distinction between first and second degree burglary was founded. (*People v. Hines* (1989) 210 Cal.App.3d 945, 950-951, disapproved on another ground in *People v. Allen, supra,* 21 Cal.4th at pp. 864-866 & fn. 21.)

Because the Quaking Aspen house did not constitute an "inhabited dwelling," there was insufficient evidence to support defendant's conviction for first degree burglary. Principles of double jeopardy prevent defendant from being retried for that degree of offense. (See *People v. Muszynski* (2002) 100 Cal.App.4th 672, 684.) This does not mean, however, that no burglary conviction can stand. Pursuant to sections 1181, subdivision 6, and 1260, "[i]f the evidence shows the defendant not guilty

14.

of the degree of the crime of which he was convicted, but guilty of a lesser degree thereof, or of a lesser crime included therein, the court may modify the judgment accordingly, without granting or ordering a new trial. [Citations.]" (*People v. Bechler* (1998) 61 Cal.App.4th 373, 378-379; accord, *People v. Enriquez* (1967) 65 Cal.2d 746, 749 & fn. 1.) "'The purpose for allowing an appellate court to modify the judgment to a lesser included offense is to "obviate the necessity of a new trial when the insufficiency of the evidence only goes to the degree of the crime." [Citation.]' [Citation.]" (*People v. Bechler*, *supra*, at p. 379.)

Defendant says the evidence did not establish a second degree burglary (meaning, we presume, we cannot modify his conviction accordingly) because there was no evidence he entered with the requisite intent. Burglary requires an entry "with the intent to commit larceny or any felony .… [Citation.]" (*People v. Foster* (2010) 50 Cal.4th 1301, 1348.) Here, the prosecutor proceeded, and the jury was instructed, on the theory defendant entered "with the specific intent to steal, take, and carry away the personal property of another … and with the further specific intent to deprive the owner permanently of that property .…"

"Because intent is rarely susceptible of direct proof, it may be inferred from all the facts and circumstances disclosed by the evidence. [Citations.] Whether the entry was accompanied by the requisite intent is a question of fact for the jury. [Citation.] 'Where the facts and circumstances of a particular case and the conduct of the defendant reasonably indicate his purpose in entering the premises is to commit larceny or any felony, the conviction may not be disturbed on appeal.' [Citation.]" (*People v. Kwok* (1998) 63 Cal.App.4th 1236, 1245; accord, *People v. Holt* (1997) 15 Cal.4th 619, 669.)

Considered in the light most favorable to the judgment, the evidence — particularly defendant's wearing gloves and failing to respond when Officer Guinn ordered anyone inside the house to make himself known, and his statements to Olsen in the patrol car — is reasonably susceptible of the conclusion defendant entered the house

with the intent to steal. It is immaterial that he conceivably only intended to take items of minor value and did not successfully acquire anything at all. (*People v. Meredith* (2009) 174 Cal.App.4th 1257, 1264; *People v. Martinez* (2002) 95 Cal.App.4th 581, 584-585.) Accordingly, the evidence is sufficient to uphold a conviction for second degree burglary.[10]

## DISPOSITION

The judgment of conviction in Kern County Superior Court case No. BF136097B is modified to provide that defendant was convicted, in count 1, of second degree burglary in violation of Penal Code sections 459 and 460, subdivision (b). As so modified, the judgment of conviction is affirmed. Sentence is vacated, and the matter is remanded to the trial court to resentence defendant accordingly. The trial court is directed not to reimpose an enhancement pursuant to Penal Code section 667, subdivision (a).

The judgment in Kern County Superior Court case No. BF138306A is affirmed.

_____
                                                    DETJEN, J.

WE CONCUR:


_____
GOMES, Acting P.J.


_____
POOCHIGIAN, J.

_____

**10** In light of our conclusion, we need not address defendant's claim of instructional error, as it pertains only to the inhabited dwelling/first degree burglary issue. We also need not determine whether the jury was properly given the option of convicting defendant of trespass (§ 602.5), a lesser *related* offense of burglary. (See *People v. Foster, supra,* 50 Cal.4th at pp. 1343-1344; *People v. Taylor* (2010) 48 Cal.4th 574, 622; *People v. Birks* (1998) 19 Cal.4th 108, 112-113, 118, fn. 8, 136-137.)