Filed 2/13/14  P. v. DeLeon CA2/6

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JOSEPH DeLEON,<br><br>    Defendant and Appellant. | 2d Crim. No. B238202<br>(Super. Ct. No. 1344677)<br>(Santa Barbara County) |

Joseph DeLeon appeals from his conviction by jury of five counts of attempted, willful, deliberate and premeditated murder (Pen. Code, §§ 664/187, subd. (a));[1] five counts of discharging a firearm at an occupied vehicle (§ 246); five counts of assaulting a peace officer with a firearm (§ 245, subd. (d)(2)); transporting methamphetamine (Health & Saf. Code, § 11379, subd. (a)); carrying a weapon concealed on one's person or in a vehicle while an active criminal gang participant (former § 12025, subds. (a)(1), (b)(3)); and attempting to dissuade a witness from testifying (§ 136.1, subd. (a)(2)). The jury also found true multiple gang benefit allegations (§ 186.22, subd. (b)) and all personal and principal firearm use allegations (§ 12022.53, subds. (c), (e)).  In bifurcated proceedings, the trial court found appellant

_____

[1] All statutory references are to the Penal Code unless otherwise stated.

had two prior serious felony convictions (§ 667, subd. (a)), and sentenced him to 480 years to life in prison.

Appellant challenges the sufficiency of the evidence to support his convictions of attempted premeditated murder, shooting at occupied vehicles, assaults on peace officers, and the gang benefit enhancements. He also contends he was deprived of a fair trial because he was shackled and placed in a glass room during trial. Because there is not sufficient evidence to support the count 10 conviction of shooting at an occupied vehicle, we reverse that count and strike the corresponding portion of the sentence. We otherwise affirm the judgment and remand to the superior court with directions to modify the abstract of judgment to conform to the judgment as modified.

FACTUAL AND PROCEDURAL BACKGROUND

*November 16, 2009, Offenses*

On November 16, 2009, Barbara Trevino, a Northwest gang member and drug dealer, and Northwest associate Albert Valdez wanted to buy drugs. Because they were having difficulty doing so, they sought help from appellant, a fellow Northwest member. He agreed. Trevino picked up appellant in her Durango SUV. When she did so, Valdez was in the front passenger seat, and appellant sat behind him.

At about 4:00 p.m., Santa Maria Police Officer Gary Steigler was driving his patrol car and noticed Trevino's SUV. Steigler activated the patrol car's roof-top emergency lights to stop the SUV. Trevino prepared to stop. Appellant pulled out a gun and told her to keep driving. She complied.

As Steigler pursued the SUV, Trevino drove around Santa Maria, exceeded the speed limit, ran through red stoplights, and committed other traffic violations. Officer Duane Schneider joined the pursuit in his patrol car, followed by Lieutenants Jerel Haley and Daniel Ast, in one unmarked car. Schneider and Haley activated their car's red lights and sirens. Schneider assumed the lead pursuit car position as they approached Betteravia. Officer Trevor Hutton joined the pursuit as Schneider turned east onto Betteravia. The SUV proceeded northbound from Betteravia onto College, and down the snake-like s-curve on College. Appellant moved to the left side of the SUV, placed a clip

2

in his gun, braced his legs, and leaned his upper torso out the left rear passenger window. He held his gun in both hands and pointed it at Schneider's car. Because College sloped downward, the SUV was below the police vehicles, which allowed all pursuing officers to see it. Appellant tracked Schneider's car with his gun. Near the end of the s-curve, appellant fired two shots at Schneider's car, from a distance of 45 to 80 feet. In response, Schneider swerved onto the right shoulder of the road. Steigler moved his car to the side, which left Hutton's car, or the car driven by Haley or, at times, both cars directly behind the SUV. Appellant fired a shot at Haley. Hutton could not move his car out of the line of fire without driving into oncoming traffic or a retaining wall. He saw muzzle flashes and thought someone was firing at him.[2]

As the chase continued, appellant moved back inside the SUV, wiped his gun with a shirt, tossed it to Valdez, and told him to throw it outside. Valdez complied. Appellant told Trevino to drive him to Benwiley Street, where his former girlfriend, Crystal Escalante, lived. Again, Trevino complied. When they reached Benwiley, appellant got out, dropped a brown paper bag, and ran from the SUV. Schneider chased and arrested him. Schneider found a cell phone, a hat, and a baggie with 1.54 grams of methamphetamine near the arrest scene.

Trevino drove away with Valdez, but stopped about a block away. Officers arrested Valdez and Trevino. They testified as prosecution witnesses at trial, after pleading guilty to several offenses.

*August 13, 2010, Offense: Attempt to Dissuade A Witness*

Appellant called Escalante from Santa Barbara County jail after his arrest. In December 2009, she stopped accepting his calls. On August 13, 2010, she received calls from Robert Parra, a Nipas gang member, who was housed two cells away from appellant. The Nipas and Northwest gangs were both affiliated with Surreno, the southern California Mexican Mafia. Parra called and asked Escalante why she was "telling on [his] homey Smiley [appellant]." Parra said he had a copy of the "paperwork"

---

[2] Cameras in Steigler's and Schneider's patrol cars recorded the pursuit. The jury viewed two videos of the pursuit, and heard an audio recording of the pursuit.

(police report) containing her statement and would send it to her. Parra told Escalante to "fix it," and said appellant was about to call her. Minutes later, appellant called Escalante. That was the only call she received from him after December 2009. Appellant professed his love for Escalante. He told her he was "a boss," even in custody, and that he would order anyone to be killed for her. He boasted that the police feared him. On August 26, 2010, Sergeant Dan Cohen and Detective Mark Streker interviewed Escalante. She told them she was afraid of being known as a "rat." At trial, Escalante testified she did not want gang members calling and asking why she was talking to the police about appellant. She did not want "paper work" with her statements to police passing around because that would endanger her children. Escalante told Cohen she was afraid to testify.

## DISCUSSION

### I

### *Substantial Evidence Claims - November 16, 2009, Offenses and Gang Allegations*

Appellant claims there is not sufficient evidence to support his convictions of attempted premeditated murder, shooting at occupied vehicles, and assaulting police officers with a firearm, or the gang enhancements. The record belies his claims.

### *Standard of Review*

"When the sufficiency of the evidence to support a conviction is challenged on appeal, we review the entire record in the light most favorable to the judgment to determine whether it contains evidence that is reasonable, credible, and of solid value from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] 'Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.' [Citation.] Unless it describes facts or events that are physically impossible or inherently improbable, the testimony of a single witness is sufficient to support a conviction. [Citation.]" (*People v. Elliott* (2012) 53 Cal.4th 535,

4

585.) The substantial evidence standard also applies to gang enhancement findings. (*People v. Villalobos* (2006) 145 Cal.App.4th 310, 321-322.)

A.

*Substantial Evidence Supports Appellant's Convictions*

*1. Attempted Murders (Counts 1-5)*

"'[A]ttempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing.'" (*People v. Smith* (2005) 37 Cal.4th 733, 739 (*Smith*).)

Viewed in the light most favorable to the verdicts, the evidence showed that appellant placed a clip in his gun, braced himself in the SUV, leaned his upper torso out its rear passenger window, and used his gun to track Officer Schneider's vehicle. Appellant fired two shots at Schneider from a distance of between 45 and 80 feet. Schneider swerved his car. Appellant fired the shots on a segment of roadway with one lane for each direction of traffic. There was a retaining wall in part of that segment which left the police no option to avoid appellant's fire unless they drove into oncoming traffic. Officers testified that the downward slope of the roadway made the SUV visible to them throughout the pursuit. Based on the record, a jury could reasonably conclude that appellant intended to kill Schneider. (*Smith, supra*, 37 Cal.4th at pp. 741-742 [intentionally firing a lethal weapon at close range supports an inference of intent to kill].)

Appellant argues his convictions for the attempted murders alleged in counts 2 through 5 must be reversed because there is not sufficient evidence that Steigler, Ast, Haley and Hutton were in a "kill zone." Our Supreme Court addressed the "kill zone" theory in *People v. Stone* (2009) 46 Cal.4th 131, 137: "[I]f a person targets one particular person, under some facts a jury could find the person *also*, concurrently, intended to kill—and thus was guilty of the attempted murder of—other, nontargeted, persons." Citing *People v. Bland* (2002) 28 Cal.4th 313, 329, the court explained: "the fact the person desires to kill a particular target does not preclude finding that the person also, concurrently, intended to kill others within . . . the "kill zone."'" (*Stone,* at p. 137.)

5

Concurrent intent exists "'. . . when the nature and scope of the attack, while directed at a primary victim, are such that we can conclude the perpetrator intended to ensure harm to the primary victim by harming everyone in that victim's vicinity. . . .'" (*Bland,* at pp. 329-330.) "'There is rarely direct evidence of a defendant's intent. Such intent must usually be derived from all the circumstances of the attempt, including the defendant's actions. [Citation.] . . .'" (*Smith, supra,* 37 Cal.4th at p. 741.) "[T]he very act of firing a weapon '"in a manner that could have inflicted a mortal wound had the bullet been on target"' is sufficient to support an inference of intent to kill." (*Id.* at p. 742, quoting *People v. Chinchilla* (1997) 52 Cal.App.4th 683, 690 (*Chinchilla*).) The trial court instructed the jury with CALCRIM No. 600, the kill zone instruction.[3]

Here, appellant asserts the victims of counts 2 through 5 were too far from the SUV to be in the kill zone. The jury reasonably concluded otherwise, where appellant fired multiple rounds at the officers, and Officer Haley testified that any of the pursuing vehicles were within range of those rounds. Further, the jury could rationally infer that appellant could see the officers' vehicles, where the downward slope of the road and the s-curve enabled officers to see him. (*Chinchilla, supra,* 52 Cal.App.4th at pp. 690-691; *Smith, supra,* 37 Cal.4th at p. 744 [intent to kill two different victims in the line of fire can be inferred from evidence that defendant fired a single shot at two victims, both of whom were visible to the defendant].) Such evidence supports the inference that appellant acted with the intention of killing Schneider and anyone in the line of fire. That inference is further supported by a statement appellant made to Escalante on the night of his arrest: "I almost cracked their asses."

---

[3] "A person may intend to kill a specific victim or victims and at the same time intend to kill everyone in a particular zone of harm or 'kill zone.' In order to convict the defendant of the attempted murder of Officer Steigler, Officer Hutton, Lt. Ast, Lt. Haley, the People must prove that the defendant not only intended to kill Officer Schneider but also either intended to kill Officer Steigler, Officer Hutton, Lt. Ast, Lt. Haley, or intended to kill everyone within the kill zone. If you have a reasonable doubt whether the defendant intended to kill Officer Steigler, Officer Hutton, Lt. Ast, Lt. Haley or intended to kill Officer Schneider by killing everyone in the kill zone, then you must find the defendant not guilty of the attempted murder of Officer Steigler, Officer Hutton, Lt. Ast, Lt. Haley." (CALCRIM No. 600.)

Appellant's reliance on *People v. Leon* (2010) 181 Cal.App.4th 452 is unavailing. In *Leon*, the defendant fired a single shot into the back of a vehicle containing three people. The bullet entered the right taillight, and traveled through the right back seat killing the right back seat passenger. This court found sufficient evidence to convict defendant of the murder of the back seat passenger and the attempted murder of the passenger seated in the front seat directly in front of the murder victim and in the line of fire. The evidence was insufficient to support the conviction of attempted murder of the driver because, given the positioning of the occupants of the car, it was physically impossible for the single bullet to strike the driver as well as the front and back seat passengers. (*Id*. at pp. 464–465.) In contrast, appellant fired multiple bullets at Schneider, in circumstances where the bullets could harm other officers in the line of fire. Based on such evidence, the jury could rationally find that appellant acted with an intent to kill all the officers who were in the line of fire. Substantial evidence supports the attempted murder convictions. (*Smith, supra*, 37 Cal.4th at p. 747.)

### 2. *Shooting At Occupied Vehicles (Counts 6-10)*

Appellant claims that there is not substantial evidence to support his convictions of shooting at occupied vehicles, in violation of section 246. We agree the count 10 conviction of shooting at an occupied vehicle is not supported by substantial evidence, but otherwise reject this claim. Section 246 provides as follows in relevant part: "Any person who shall maliciously and willfully discharge a firearm at an . . . occupied motor vehicle . . . is guilty of a felony . . . ." Appellant argues that he cannot be convicted of any counts of shooting at an occupied vehicle because there is no evidence that he fired "at" the vehicles. This argument is not persuasive. The named victims testified that appellant fired his gun at them. Further, appellant had a clear view of them. This evidence supports the inference that appellant fired his gun *"at"* the officers' vehicles.

Appellant correctly argues that there is not substantial evidence to support the count 10 conviction of shooting at an occupied vehicle. The prosecution named Officer Ast as the victim of count 9 and Officer Haley as the victim of count 10, which

7

both charged appellant with shooting at an occupied vehicle. However, Ast and Haley occupied the same vehicle. In order to prove that a defendant has violated section 246, the "People must prove that: . . . [¶] . . . The defendant shot the firearm at an occupied motor vehicle." (CALCRIM No. 965.) In essence, respondent argues that shooting at one vehicle which contains two occupants can support two counts of violating section 246. The argument would make sense if section 246 prohibited shooting at the occupant of a vehicle. It does not; it prohibits shooting at an occupied vehicle. Respondent cites no persuasive authority to support its argument, and we reject it. We will reverse the count 10 shooting at an occupied vehicle conviction.

### 3. Assaulting Peace Officers With a Firearm (Counts 11-15)

Appellant argues there is not sufficient evidence to support his convictions of assaulting a peace officer because the prosecution failed to prove he had the "present ability" to commit the assaults. More specifically, he asserts he did not "position[] himself" to carry out a battery on any of the officers, particularly those in the vehicles behind Schneider's lead pursuit vehicle. We disagree. Appellant loaded his gun, leaned his upper torso outside the SUV, held the gun, and tracked Schneider's car, while the other victims were in his line of fire. Appellant waited to shoot at the officers until he was on the downward sloping s-curve segment of the road, with one lane for each direction of traffic. He could see the police cars as he fired. The evidence supports the inference that appellant positioned himself to assault the victims, and had the present ability to inflict injury on them.

### B.

### *Substantial Evidence Supports the Gang Enhancement Finding*

### *Background*

Prosecution gang expert witness Sergeant Dan Cohen testified that gangs have hierarchies, and their conduct is driven by gang concepts of respect, reputation, and retaliation. Gang members elevate their status and reputation within a gang by committing violent crimes in front of others, and often commit crimes with fellow gang members. The shot callers, at the top of the gang's hierarchy, have committed the most

violent crimes and served time in prison. Members have to "earn [their] stripes" or "rank" by "putting in work" (committing crimes) for the gang. Committing violent crimes intimidates the community and increases the gang's respect and reputation among other gangs. To protect the gang's respect and reputation, members must retaliate if others disrespect the gang.

Gangs also use graffiti and tattoos to intimidate the community, victims and witnesses. Large and prominently displayed tattoos show a member is committed to the gang. The gang permits members with the most respect to have the most tattoos. Gangs retaliate violently against members who snitch (provide information to law enforcement). Gangs use police reports or "paper work" to identify snitches, and require members to prove they are not snitches. Because victims and witnesses fear retaliation, they do not report everything to law enforcement or always appear in court.

Sergeant Cohen testified that Santa Maria gangs belong to the Southern California Mexican Mafia (Surreno or Sur), which regulates its members' conduct and requires them to share the proceeds of their crimes (taxes) with Surreno. It puts a "green light" on members who fail to do so, which authorizes anyone to attack them. Surreno also regulates its members in prison and jail. It awards members who commit violent attacks in prison by allowing them to get a "kanpol" tattoo, with an Aztec symbol, number 13, and an Aztec war shield. Northwest is the oldest and most violent gang in Santa Maria. Northwest tattoos say Northwest S.M., Evans Park, Projects, P.J., X-3, Ese Eme, or N.W. Northwest's primary activities are stabbings, shootings, murders, and other violent crimes.

Appellant is an admitted Northwest member who uses the monikers Smiley and Dodger. He has many tattoos that reflect his high standing in Northwest and Surreno, including a kanpol and an Aztec war shield.

Trevino claimed to be a founding member of Northwest. Her family members belong to Northwest. She has helped gang members hide and destroy evidence, and leave town. She sold drugs and paid taxes to Surreno. Cohen opined that Trevino was the "den mother" of Northwest.

9

Valdez is a Northwest associate who uses the moniker Chubbs. He associated with Northwest on the street and in jail.

In response to a hypothetical that mirrored the facts of the November 16, 2009, shootings, Cohen opined that the perpetrator shot the police officers, attempted to kill them, and shot at their occupied vehicles for the benefit of his gang. He based his opinion on several facts, including the following: gangs view police officers as their enemies; gang members who kill police officers are viewed as heroes in the gang culture; such shootings show the gang is not afraid to commit violence against anyone, which intimidates the community, including victims and witnesses, and deters reporting and testifying about gang crime, or motivates them to lie in court.

In response to a hypothetical based on the mirrored facts underlying the August 13, 2010, attempt to dissuade a witness, Cohen opined that the callers threatened the witness at the direction of the gang. He noted the following facts: the perpetrator (shooter) directed another gang member to call a witness, say a gang member possessed her paper work, ask the witness why she was cooperating with law enforcement, and tell the witness to fix the problem. Threatening a witness benefits the gang by motivating that witness to lie in court and intimidating other witnesses from cooperating with the police, which reduces prosecutions against gang members.

A gang enhancement requires proof of the existence of a criminal street gang and that the offense was "committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members . . . ." (§ 186.22, subd. (b)(4).)

"In order to prove the elements of the criminal street gang enhancement, the prosecution may . . . present expert testimony on criminal street gangs." (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1047-1048.) An expert may give opinions regarding the knowledge and intent of a hypothetical gang member. (*People v. Gonzalez* (2006) 38 Cal.4th 932, 946-947, fn. 3.) The expert may explain the gang's motivation for committing criminal offenses and describe how they benefit the gang. (*People v. Vang* (2011) 52 Cal.4th 1038, 1048-1049.) "[A] trier of fact may rely on expert testimony

10

about gang culture and habits to reach a finding on a gang allegation." (*In re Frank S.* (2006) 141 Cal.App.4th 1192, 1196.)

In challenging the sufficiency of the evidence to support the gang benefit enhancements, appellant argues there is no evidence that he committed counts 1 through 15 with the intent to benefit the gang, or promote, further or assist their criminal conduct. We disagree. Although he argues he merely intended to see Escalante while he evaded and fired his gun at the police, the jury was not compelled to accept his version of the events. Appellant committed the crimes with another gang member and a gang associate. (*People v. Villalobos, supra*, 145 Cal.App.4th at p. 322 ["[c]ommission of a crime in concert with known gang members is substantial evidence which supports the inference that the defendant acted with the specific intent to promote, further or assist gang members in the commission of the crime"].) Gang expert witness Sergeant Cohen opined that appellant committed the crimes for the benefit of the Northwest gang. (*People v. Gardeley* (1996) 14 Cal.4th 605, 618-619 [expert testimony held sufficient to support finding that defendants committed crimes with specific intent to promote criminal conduct by street gang].)

Appellant claims, with respect to the count 17 gang enhancement, that there is no proof he acted in association with, or at the direction of, the gang in carrying a concealed firearm in a vehicle while an active gang participant. (Former § 12025, subds. (a)(1), (b)(3).) The record belies his claim. Appellant, an admitted Northwest member, accompanied Northwest member Trevino and Northwest associate Valdez, at their request, to help them find a source for drugs. He took his concealed gun into the SUV, and remained there with Trevino and Valdez after he displayed and fired the gun. Valdez complied with appellant's direction to toss it from the SUV after the shootings. Substantial evidence established that appellant acted in association with other gang members in concealing a firearm in a vehicle while an active gang participant.

11

## II

### *Shackling and Restraint*

Appellant contends the court violated several of his federal constitutional rights by ordering that he remain in a separate glass room, within the courtroom, with his left hand secured to a chair, and restraints on his ankles. We disagree.

### *Background*

Appellant represented himself in the trial court. Before trial, in April 2011, he repeatedly assaulted jail personnel by throwing a mixture of urine, fecal matter and soap at them ("gassing" them). He had been cited previously for many acts of misconduct while in custody. In April, the sheriff asked the court to impose restraints on appellant. The court revoked appellant's pro per status and ordered his placement in a glass room in the courtroom. Later that month, the court reinstated his pro per status, but did not reinstate the glass room order.

In June 2011, the sheriff sought an order restricting appellant's pro per privileges, based on multiple incidents of misconduct throughout his incarceration. Such misconduct included possessing a syringe and hypodermic needle; inciting a disturbance by throwing water at an officer; jamming the cell door lock which required additional personnel to remove him; threatening a witness during a phone call; and the April 2011 gassing incidents. On April 14, 2011, appellant tried to coordinate his court date with that of another inmate while they were prohibited from having any contact. The court granted the sheriff's motion to restrict appellant's pro per access to the jail's laptop computer.

In August 2011, two months before trial, the sheriff filed a motion to have appellant physically restrained in the courtroom for the safety of the parties, courtroom personnel, jurors, witnesses, and the public. In addition to citing appellant's other recent misconduct, the motion stated appellant told an officer he would cease his disruptive behavior and stop gassing officers if jail personnel would move his cousin into the adjacent cell. In September, the trial court granted the sheriff's request to physically restrain appellant, but denied his request that he be placed in a glass room.

12

On October 19, 2011, the parties discussed the physical restraints on appellant's left wrist and ankles, and their visibility. Appellant's left hand was in a clear handcuff and attached to a belly chain, and his legs were restrained. The restraints were visible from the jury box. The court inquired whether it was necessary to restrain his hands. The sheriff's representative (sheriff) responded such restraint was required based on appellant's history of misconduct, including challenging jail deputies to fight in January and May 2010; his April 2010 refusal to be removed from his cell; failing to follow instructions; passing an item to another inmate; entering unauthorized areas; and possessing "pruno" (jail-made alcohol) in August 2010. The sheriff further advised the court that appellant and two other pro per inmates had formed a group called "Team G" which planned to attack courtroom sheriff's deputies or deputy district attorneys. Because it would be difficult for appellant to represent himself with one hand, the court asked whether a chair could be secured to the courtroom floor. The sheriff stated that was not possible. Based on appellant's aggressive and disruptive conduct in jail, the court found that securing his left hand to a chair and imposing leg restraints was appropriate under *People v. Duran* (1976) 16 Cal.3d 282. It denied the sheriff's request to order appellant to sit in a glass room within the courtroom during proceedings. The court further ordered that everyone at counsel table must remain seated during proceedings.

On the following day, October 20, 2011, the sheriff advised the court that jail personnel had just discovered a weapon in appellant's cell, in a legal mail envelope, with other documents in his pro per box. The weapon was constructed from perforated metal material that covers the bars in some jail cells. It was approximately four inches long, with half-circle, uniform scallops across the top and bottom edges of its length, and metal projections between the scallops. It could fit into a hand, like brass knuckles. Its ends were sharpened, like a stabbing weapon. A photograph of the weapon is attached to this opinion as Exhibit "A." The sheriff urged the court to order that appellant be placed in a glass room, within the courtroom, alone, without advisory counsel. The court noted that another Team G member recently concealed a weapon, brought it to the courthouse, and stabbed a deputy in the face, and that appellant's witness list included that Team G

13

member. The court found that appellant posed a tremendous risk to the safety of court personnel and ordered that he be seated in a glass room during proceedings. After advisory counsel objected that it would be difficult or impossible to assist appellant if he were sitting alone in the glass room, the court permitted counsel to sit there with him, except on occasions when appellant wished to stand.

"[A] criminal defendant may be subjected to physical restraints in the jury's presence upon 'a showing of a manifest need for such restraints.' [Citations.] This requirement is satisfied by evidence that the defendant has threatened jail deputies, possessed weapons in custody, threatened or assaulted other inmates, and/or engaged in violent outbursts in court. [Citations.]" (*People v. Lewis* (2006) 39 Cal.4th 970, 1031-1032.) Although the court's decision to restrain a defendant must be based on more than rumor or mere innuendo, a formal evidentiary hearing is not required. (*Id*. at p. 1032.) "A shackling decision will be upheld absent a manifest abuse of discretion. [Citation.]" (*Ibid*.)

Appellant concedes there was an adequate basis to impose security precautions such as shackling his legs and securing one of his wrists to a chair, but he argues the court restrained him unnecessarily by ordering him to sit in a glass room in addition to being shackled. Appellant's reliance on *People v. Miller* (2009) 175 Cal.App.4th 1109, is unavailing. In *Miller*, the People conceded that the trial court had abused its discretion in shackling the defendant, and the record was devoid of any evidence as to how the defendant's conduct rendered him a threat to courtroom security, and the trial court made no findings in that regard. (*Id*. at p. 1114.) That is not the case here, as the foregoing discussion explains. Appellant had a long history of noncompliance, aggression, and disruptive conduct in jail; shortly before trial, he concealed a weapon in his cell among his pro per materials; and he was connected with the inmate who had recently stabbed a courtroom deputy with a concealed weapon. The trial court did not abuse its discretion in ordering that appellant be shackled and remain seated in a glass room, within the courtroom, in order to protect others.

14

Citing *People v. Harrington* (1871) 42 Cal. 165, 168, and other cases, appellant claims that his placement in the glass room violated his rights to confront his accusers, to be personally present at trial, and impaired his ability to defend himself. Nothing indicates that he was unable to see exhibits, to hear or clearly see any of the witnesses who testified, or that they were unable to see or hear him. (Compare *Coy v. Iowa* (1988) 487 U.S. 1012, 1019-1020.) To the contrary, he questioned witnesses at length, presented and referred to exhibits in a manner reflecting his understanding of them, and presented his argument to the jury.

DISPOSITION

The count 10 shooting at an occupied vehicle offense is reversed, and the sentence imposed for that offense is stricken. The superior court shall amend the abstract of judgment accordingly and forward a copy to the Department of Corrections and Rehabilitation. The judgment is otherwise affirmed.

NOT TO BE PUBLISHED.

PERREN, J.

We concur:

GILBERT, P. J.

YEGAN, J.

15

Edward H. Bullard, Judge

Superior Court County of Santa Barbara

_____

Leonard J. Klaif, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, James William Bilderback III, Supervising Deputy Attorney General, Peggy Z. Huang, Deputy Attorney General, for Plaintiff and Respondent.



Exh. "A"

17