Filed 1/25/16  P. v. Gauthier CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>　　v.<br><br>BERTHO GAUTHIER,<br><br>　　　Defendant and Appellant. | D066986<br><br><br>(Super. Ct. No. SCE326316) |

APPEAL from a judgment of the Superior Court of San Diego County, John M. Thompson, Judge.  Affirmed.

Nancy Olsen, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Charles C. Ragland, Scott C. Taylor and Kathryn Kirschbaum, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant Bertho Gauthier, was convicted of several counts of armed robbery and sentenced to a term of 38 years four months in prison. Police arrested defendant on the same day he robbed three liquor stores in San Diego County. Investigators soon determined that defendant was the suspect in a number of earlier armed robberies. Defendant's fingerprints matched a latent fingerprint left at the scene of a robbery committed a few months prior to his arrest in San Marcos, California, and ballistic evidence linked a gun found in defendant's car to three other armed robberies committed in San Diego and Orange Counties. Police investigators also found video surveillance footage of two robberies of Little Caesar's Pizza restaurants (Little Caesar's) in northern San Diego County, which linked defendant to those robberies.

Defendant contends the evidence presented at trial is insufficient to support an enhancement for deliberately discharging a firearm during one of the robberies. He claims victim testimony shows the gun was fired accidentally rather than intentionally. Defendant also contends the record lacks sufficient evidence he robbed the two Little Caesar's Pizza restaurants in northern San Diego County. According to defendant, witness descriptions of the suspect in the Little Caesar's robberies and surveillance video footage showing a masked man resembling defendant is not sufficient evidence he robbed the two Little Caesar's. We find sufficient evidence of the enhancement and the robberies. Accordingly, defendant's convictions are affirmed.

## PROCEDURAL OVERVIEW

In July 2013, the San Diego County District Attorney charged defendant with 12 counts[1] of robbery in violation of Penal Code section 211;[2] four counts of making a criminal threat;[3] and one count of assault with a firearm.[4] The prosecution alleged a number of sentence enhancements, including personally discharging a firearm as to counts 3 through 7. In late August 2014, six of the counts against defendant, including all of the counts of making a criminal threat and assault with a firearm, were dismissed on motion by the district attorney.[5] A jury convicted defendant of all 11 remaining counts of robbery and found true all special allegations relating to those counts. The court sentenced defendant to a determinate prison term of 38 years four months.

## FACTUAL OVERVIEW

Defendant committed nine robberies of shops and restaurants in San Diego and Orange Counties between October and December of 2012. Defendant is a five-foot eight-inch tall African-American man who weighs 180 pounds and was 25 years old at the time of his convictions.

---

[1]     Counts 1-10, 12 and 13.

[2]     All further statutory references are to the Penal Code unless otherwise indicated.

[3]     Section 422; counts 11, 15, 16 and 17.

[4]     Section 245, subd. (a)(2); count 14.

[5]     Counts 7, 11, 14, 15, 16 and 17.

A.  The Robbery of the Smoke Shack in San Marcos

The first robbery occurred at the Smoke Shack, a tobacco store in San Marcos, California.  On October 12, 2012, a robber approached the owner of the Smoke Shack, pointed a gun at him, and demanded money from the cash register.[6]  After the owner handed over the money, the robber took the owner to the store's bathroom and ordered the owner to count to 100.  The robber left while the owner counted.  The owner described the robber as tan skinned, about 5 feet 10 inches tall and 180 pounds with a medium build.  He described the robber's handgun as being medium caliber, potentially a nine-millimeter, and having blue painter's tape wrapped around the barrel.

The store had a surveillance system that recorded video of the robbery, which was shown to the jury.  The video showed a robber with tan skin (or an African-American with a light complexion) dressed in black shoes, a black or dark blue hoodie-style sweatshirt with the hood pulled up over the back of the head, loose-fitting gray pants and a loose-fitting gray ski mask that covered his whole face except for the area around his eyes, which were visible through a single, large eye hole.  The mask was draped over the front of the robber's neck like a bandana.  As he entered the store, the robber appeared to conceal a handgun in a front pocket of the sweater and revealed the gun as he walked up to the counter.  He held a black bag with his left hand and a gun with his right.  The handgun was a black or dark-colored semiautomatic with what appeared to be blue painter's tape wrapped around the barrel.  The black bag had a white tag.

---

[6]    All events described from this point on occurred in 2012 unless otherwise noted.

A San Diego County Sheriff's deputy reviewed the footage and noticed the robber was not wearing gloves and touched a glass display case with his bare hand. The deputy dusted the display case for prints and recovered a fingerprint.

B. The Robbery of the Little Caesar's in San Marcos

A Little Caesar's in San Marcos was robbed on November 4. The robber entered the restaurant brandishing a handgun as he approached the counter and demanded money. An employee emptied out a cash register and placed the money into a bag provided by the robber. The robber then ordered the employee onto the ground and left the restaurant. The employee described the robber as an African-American male with a dark complexion and a medium build in his early 30's. He described the gun as being a black handgun, possibly a nine-millimeter.

Once again, surveillance cameras recorded video footage of the robbery, which was also shown to the jury. The video footage from the robbery showed an individual quite similar to the robber of the Smoke Shack, except he was now wearing black gloves with a noticeable gray lining where the velcro straps would be located on a typical work glove. The robber carried a black bag for the money, though the bag used in this robbery was shiny and appeared to be a plastic shopping bag. The robber once again wielded a black or dark-colored semiautomatic handgun, though this time there was no blue tape visible on the barrel. He entered the store already holding the gun in his right hand and the bag in his left. The robber often held the gun sideways when aiming it at the employee.

5

C.  The Robbery of the Inner Limits Store in San Clemente

On November 6, the Inner Limits store in San Clemente, California was robbed. The robber confronted two employees working near the registers, demanding they give him money while pointing a black handgun at them.  The employees were shocked and not certain whether they were really being robbed or someone was playing a joke on them.  They did not immediately comply, and the robber fired a shot into a display.  The employees then emptied the two cash registers into a bag provided by the robber.  The robber told the employees to "kiss the ground," and they crouched down on the floor as the robber left the store.  After the robber left, the employees called the police.

Deputies from the Orange County Sheriff's Department responded to the call.  A deputy surveyed the crime scene and noticed copper jacketing from the spent bullet near the glass case the robber shot.  A "40 S & W federal casing" and two bullet fragments were recovered at the crime scene.

Once again, the robbery was captured on a surveillance camera, and the video was shown to the jury.  The video footage showed a robber with a build and skin tone similar to the robber of the Smoke Shack and the Little Caesar's in San Marcos.  Like the previous two robberies, the robber wore black shoes, a loose-fitting gray ski mask and gray pants that were seemingly the same as those worn by the robber of the San Marcos stores.  As in the San Marcos Little Caesar's robbery, the robber here appeared to be wearing black gloves with a gray lining along the velcro strap.  The hooded sweatshirt worn by the robber was different this time as it was red instead of black or dark blue. The robber also used a black bag that appeared to have a white tag on it.  The gun

6

appeared to be hidden under the bag and was not visible in the video; however, the robber once again held the bag with his left hand as he entered the store.

D. The Robbery of the Happiness Nails Salon in Vista

The Happiness Nails salon in Vista, California was robbed on November 21. The robber entered the salon and announced his intent to rob the store. Nobody moved, and the robber responded by firing a shot into the ceiling from a handgun. The robber then pointed the gun at a worker behind the cash register and demanded money. The worker gave the robber all the money in the register, which the robber put into a black bag. After receiving the money, the robber ordered everybody to the back of the salon and left.

One witness described the robber as being a five-foot five-inch tall African-American male, though other witnesses described the robber as being 5 feet 8 to 5 feet 9 inches tall. A few days after the robbery, a nephew of one of the salon's employees discovered a bullet while repairing the salon's air conditioning. The bullet was provided to the San Diego County Sheriff's Department.

As in the other robberies, surveillance cameras inside the salon captured footage of the robbery, and the footage was shown to the jury. The physical features of the robber were similar to the features of the robber at the San Marcos and Orange County robberies. The robber wore loose-fitting gray pants and a gray ski mask. Unlike the previous robberies, this time the robber did not wear a hooded sweatshirt but instead wore what appeared to be a hoodless gray sweatshirt. The robber again wore black gloves with a gray lining along the velcro straps. The black bag appeared to have a white tag. Once again the robber held the black bag with his left hand and the gun with his right. He appeared to conceal the gun under the black bag as he entered the store, before

7

quickly revealing it. The robber also appeared to be holding a white-colored bag around his gun for shell casings. The surveillance footage shown to the jury was recorded by playing the original footage on a monitor and recording that footage with a camera, resulting in a relatively low quality video recording. A San Diego County Sheriff's deputy who watched the original footage described the bag the robber used to collect shells as a shopping bag.

E. The Robbery of Roberto's Taco Shop in San Diego

Roberto's Taco Shop in San Diego, California was robbed on December 1. The robber approached the counter, where the store owner, Fermin Martinez, was working. The robber pointed a gun at Martinez and demanded money. Another worker, Jorge Rodriguez was present and gave a short account that is largely similar to Martinez's testimony.

Martinez initially suspected he was the victim of a prank being played by a customer who had just left the restaurant. In response to the robber's demands, Martinez told him to "Take the money yourself." The robber chambered a round in the gun and asked Martinez, "do you think I'm joking?" At that point, Martinez realized he was actually being robbed. He opened the cash register and told the robber to take the money. The robber replied, "No[, y]ou do that" and held out a drawstring bag in one hand while pointing the gun at Martinez with the other. Martinez asked the robber if he wanted just the paper dollar bills or the coins as well. The robber responded by asking Martinez if he thought he was playing around. The robber then pointed his gun downward and fired one shot. Either before or after the robber fired the shot, Martinez took all of the paper money out of the cash register and placed it inside the robber's bag. Martinez gave the

8

robber all of his paper currency, but none of the coins. After firing the shot, the robber told Martinez and Rodriguez to get on the ground and then left the restaurant.

A San Diego police officer responded to the robbery call and recovered a fired cartridge case from the floor of the restaurant and a bullet from inside one of the restaurant's walls. The shell casing was from a "Smith and Wesson 40," and the cartridge was marked "S&W Federal." There was no surveillance footage of the robbery at Roberto's Taco Shop.

F. The Robbery of the Little Caesar's in Rancho Bernardo

Another Little Caesar's in the northern San Diego County community of Rancho Bernardo was robbed on December 10. Video surveillance footage showed the robber standing and pacing around in the restaurant for about 45 seconds before an employee came out of the back of the restaurant into view of the robber. The robber approached a counter, pointed a gun at the employee and demanded money from the cash register, threatening to shoot the employee if he did not hurry. The robber left immediately after being handed the money without issuing any further instructions to the employee.

The employee saw a white Mitsubishi Eclipse with a spoiler quickly leave the parking lot shortly after the robbery, leading him to believe the car may have belonged to the robber. The employee described the robber as being a six-foot four-inch tall African-American man with light complexion and medium build. The employee was unable to conclusively identify defendant as the robber at trial, but simply stated: "He looks familiar." On cross-examination, the employee admitted he was unable to identify a photograph of the defendant as the robber in a photographic lineup.

9

The robbery was recorded by surveillance cameras and, like the other videos, the recording of the robbery was played for the jury. The video showed a robber with the same build and skin tone as in the earlier robberies. The robber appeared to be wearing the same gray ski mask and gloves as before. In the tape, the robber entered the store holding a dark-colored semiautomatic handgun in his right hand and a black bag with a white tag in his left, initially using the bag to conceal the gun from view. The robber often held the gun sideways while aiming at the employee. The video clearly showed the robber using a white-colored translucent bag similar to a hairnet to collect any shells discharged by his handgun.

G. Defendant's Arrest and Trial

Three San Diego area liquor stores were robbed on December 21. Unlike the previous robberies, the robber did not wear a ski mask but instead drew a fake beard on his face using makeup. A La Mesa police officer arrested defendant approximately three hours after the final robbery. The officer found a handgun in the passenger seat of defendant's rental car. The gun was a "Springfield Armory SC-40" loaded with a 40-caliber federal bullet in the chamber. One police officer described the gun as being painted in an olive green color and having blue tape on the barrel. Descriptions of the gun given by both the prosecution and the defense during closing arguments indicate that the gun recovered was a multicolored semiautomatic handgun that was dark colored on the top and green around the handle.

A search of defendant's car revealed goods and money likely stolen from stores earlier in the day and other evidence. Items found in defendant's car that are of relevance to this appeal include: a white hairnet similar to that used in the Rancho Bernardo Little

10

Caesar's robbery to collect shell casings, a plain black hooded sweatshirt similar to that worn in the robberies of the Smoke Shack and the two Little Caesar's, a black drawstring bag with a large golden Michael Jordan jump man logo on the sides that had been turned inside out so the bag appeared plain black, and a pair of black work gloves with a gray pattern lining the velcro.

A fingerprint expert with the San Diego County Sheriff's Department testified at trial that defendant's fingerprints matched a latent fingerprint collected at the Smoke Shack in San Marcos. A firearms expert with the San Diego County Sheriff's Department testified that ballistics evidence matched the firearm found in defendant's car to the gun used in the robberies of the Inner Limits store in San Clemente, the Happiness Nails salon in Vista, and Roberto's Taco Shop in San Diego.

An investigator with the San Diego County Sheriff's Department in charge of investigating the robbery of the Little Caesar's in San Marcos opined that based upon comparisons of surveillance video, he believed the robber in the San Marcos Little Caesar's robbery was the same person who robbed the Smoke Shack in San Marcos and the Little Caesar's in Rancho Bernardo.[7]

At trial, defendant's attorney conceded that defendant committed the final robbery but argued that evidence tying defendant to the other robberies was insufficient,

---

[7] The investigator did not mention the Smoke Shack by name in his testimony, but his statement that a suspect was linked to the robbery by a fingerprint and the location of the robbery in San Marcos implies that the investigator was talking about the Smoke Shack. The investigator also refers to the robbery of a Little Caesar's within the jurisdiction of the San Diego Police Department. Presumably, he was referring to the robbery in Rancho Bernardo as there are no other robberies of Little Caesar's restaurants within the city limits of San Diego mentioned in the record.

particularly the robberies where the only evidence to tie defendant to the robbery was eye witness descriptions, items found in defendant's car that resembled items worn or used by the robber, and video footage.

DISCUSSION

A. Standard of Review

On appeal, we review questions of fact under the substantial evidence test. " 'The test on appeal is whether substantial evidence supports the conclusion of the trier of fact, not whether the evidence proves guilt beyond a reasonable doubt. [Citation.] The appellate court must determine whether a reasonable trier of fact could have found the prosecution sustained its burden of proving the defendant guilty beyond a reasonable doubt.' " (*People v. Johnson* (1980) 26 Cal.3d 557, 576.) However, whether undisputed evidence is sufficient to support a conviction is a question of law which the court determines de novo. (*People v Villalobos* (2006) 145 Cal.App.4th 310, 316, fn. 3.) "Evidence, to be 'substantial' must be 'of ponderable legal significance . . . reasonable in nature, credible, and of solid value.' " (*People v Johnson*, *supra*, at p. 576.) The testimony of a single witness that meets these standards is sufficient to support a conviction "[e]ven when there is a significant amount of countervailing evidence." (*People v Barnwell* (2007) 41 Cal.4th 1038, 1052.) "In deciding the sufficiency of the evidence, a reviewing court resolves neither credibility issues nor evidentiary conflicts. [Citation.] Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact. [Citation.]" (*People v. Young* (2005) 34 Cal.4th 1149, 1181.)

12

B. Sufficiency of the Evidence that Defendant Deliberately Discharged his Firearm

Defendant contends the record lacks sufficient evidence to support his conviction for intentionally discharging a firearm while robbing Roberto's Taco Shop. Defendant's argument rests largely upon the testimony of Fermin Martinez, the owner of the restaurant, and his employee Jorge Rodriguez. Martinez testified in Spanish via a translator. On direct examination, Martinez was asked multiple times about the point in the robbery where defendant discharged the gun. When discussing the discharge, Martinez stated, "the bullet got away from [defendant]" and "the shot went off and got away from [defendant]." Martinez testified, "[defendant] was just asking me to give him the money and I did give him the money. I gave him the bills. And that's when I asked him if he also wanted the coins, at which point he said -- he asked me if I thought he was playing around. And that's when the shot went off and got away from him." The prosecutor later asked Martinez if he handed over the money *after* defendant fired the gun, to which Martinez replied, "yes." Rodriguez testified that Martinez handed over the money before defendant fired the gun.

A reviewing court will not disturb a jury's verdict if it is supported by substantial evidence—evidence that when evaluated in light of the whole record is " 'of ponderable legal significance . . . reasonable in nature, credible, and of solid value.' " (*People v. Johnson*, *supra*, 26 Cal.3d at p. 576.) " '[T]his inquiry does not require a court to 'ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.' [Citation omitted.] Instead the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of

13

fact could have found the essential elements of the crime beyond a reasonable doubt.' " (*Ibid.*) In the face of conflicting testimony, it is solely up to the jury to decide which testimony to credit. (*People v. Young*, *supra*, 34 Cal.4th at p. 1181.)

We find that the record contains substantial evidence that defendant intentionally discharged the firearm. Contrary to defendant's contentions, the circumstances described by Martinez provide ample motivation for defendant to discharge the firearm. Martinez initially thought a prank was being played on him and was uncooperative. Martinez insisted that defendant take the money out of the cash register himself, while defendant demanded that Martinez remove the money from the register and place it into the bag defendant was holding in his hand. Martinez then asked defendant if he wanted just paper currency or the coins as well. Defendant appeared to have been annoyed by this question as he responded by asking Martinez if he thought he was joking and then pointed the gun downwards and fired. There are other instances in the record where defendant discharged a firearm when victims were slow to cooperate and, from these facts, a reasonable jury could infer that defendant deliberately fired the gun.

Defendant argues he had no reason to fire the gun because Martinez had already handed him the money. However, there is conflicting evidence on this issue. Some of Martinez's testimony is phrased in a way that suggest he gave defendant the money before defendant fired the gun, but Martinez later clarified that it was *after* the gun was fired that he gave defendant the money. Rodriguez testified that defendant fired his gun after Martinez handed over the money. In the face of such contradictory testimony, the jurors were empowered and capable of determining which testimony to credit and which to discount.

14

Even if the jurors did conclude that Martinez handed over the money before defendant fired the shot, there is still reason to conclude that defendant fired the gun deliberately rather than accidently. As we noted, Martinez had not been entirely cooperative and defendant asking Martinez if he thought he was playing around just before firing the shot could be interpreted as an expression of annoyance or exasperation towards Martinez. From these facts, the jury could have reasonably concluded that defendant fired a single shot to frighten Martinez in retaliation for Martinez's initially uncooperative response.

Defendant relies heavily on Martinez's statements that the bullet or shot "got away" from defendant as evidence that he accidently rather than deliberately discharged the gun. This is indeed an odd phrase, but it does not clearly convey that the gun went off accidently and the surrounding circumstances strongly indicate that defendant fired the gun deliberately as a means of scaring Martinez. In sum, the evidence defendant deliberately discharged his gun is sufficient to support his conviction.

C. Sufficiency of the Evidence that Defendant Robbed the Little Caesar's Restaurants

Defendant contends that the record lacks sufficient evidence to support his convictions of robbing the Little Caesar's in San Marcos and Rancho Bernardo because the eye witness descriptions, video surveillance, and items found in defendant's trunk do not disclose any details regarding the identity of the robber or robbers that are distinctive enough to provide sufficient evidence of defendant's guilt.

Once again, the jury's factual determinations will be upheld as long as there is substantial evidence in the record to support the jury's findings. (*People v Johnson*, *supra*, 26 Cal.3d at p. 576.)

The robber of the San Marcos Little Caesar's was practically an identical twin to the robber of the Smoke Shack. Except for the addition of the black gloves and a possibly different bag, the robber in both San Marcos area robberies was dressed the same and had the same skin complexion and build. Experts for the prosecution matched defendant to a latent fingerprint left on a display case at the Smoke Shack, and defendant does not dispute that the prosecution presented substantial evidence of his guilt for the Smoke Shack robbery. The gloves also appeared to be the same gloves worn in other robberies (most of which were linked to defendant through ballistic evidence) and found in the trunk of defendant's car. As in every other robbery, the robber used a dark-colored semiautomatic handgun and held the gun in his right hand and the bag in his left. The robber also wore a black hooded sweatshirt similar to the one worn in the Smoke Shack and Rancho Bernardo robberies and discovered in the trunk of defendant's car.

In isolation none of the robber's clothing, physical features, or behavior are unusual or rare, but when put together the result is a compelling case that the robber who robbed the Little Caesar's in San Marcos is the same robber who robbed the Smoke Shack and other stores and restaurants in the San Diego area. In other words, in the context of the entire record, the video footage provides substantial evidence that defendant committed the robbery.

We also find the prosecution presented sufficient evidence that defendant robbed the Little Caesar's in Rancho Bernardo. The robber of the Rancho Bernardo Little

16

Caesar's bore a strong resemblance to the robber in the other videos. He was similar to defendant in physical characteristics and appeared to be wearing the same mask and gloves defendant wore in most of the other robberies. He also wore a plain black hoodie that may be the same as worn in other robberies and found in the trunk of defendant's car. As in the other robberies, the Rancho Bernardo robber used a black bag to carry stolen money, which may be the same one found in defendant's car. The black bag in the video had a noticeable white tag hanging on it as does the bag in video footage taken from the robberies of the Smoke Shack, the Inner Limits store, and the Happiness Nails salon, which were linked to defendant by additional forensic evidence. As in the other robberies, the robber used a dark-colored semiautomatic handgun, which he held with his right hand, while holding the bag with his left. Like the other Little Caesar's robbery, the robber frequently held the gun sideways while aiming it at his victim. These circumstances are sufficient to support defendant's conviction for the robbery of the Rancho Bernardo Little Caesar's.

In support of his theory that the record lacks sufficient evidence of guilt in the two robberies not tied to him by forensic evidence, defendant cites various discrepancies in the record which he contends show there is no discernable pattern to the robberies that could lead a reasonable juror to find he committed the Little Caesar's robberies. These discrepancies include: variations in physical descriptions of the robber by witnesses; the robber not using a glove in the robbery of the Smoke Shack in San Marcos; the robber using a white bag to collect shells in the Happiness Nails salon and Rancho Bernardo Little Caesar's robberies, but not in the Roberto's Taco Shop robbery that happened chronologically between them; the robber using a plastic shopping bag rather than a

fabric drawstring bag in the San Marcos Little Caesar's robbery; the lack of visible blue tape on the handgun in all the robberies between the Smoke Shack robbery and defendant's arrest; witnesses describing the robber's semiautomatic handgun as black when the gun recovered from defendant's car was at least partially colored green; and the robber not wearing gloves or a ski mask or using a white hairnet to collect shells during the three liquor store robberies on the day defendant was arrested.

There is indeed evidence in the record that could support a theory that defendant did not commit all of the robberies, but there are also reasonable explanations for these discrepancies that reconcile them with the prosecution's theory of the case. Variations in the physical description of the robber given by witnesses can be attributed to faulty memory. The prosecution suggested that variations in the type of bag used, the use of gloves, et cetera could be attributed to defendant experimenting with different tools and methods. As to discrepancies regarding the gun, the prosecutor suggested that while holding the gun, defendant likely concealed most of the green portion of the gun with his hand and the witnesses only saw the top portion of the gun, which was black or dark colored. The prosecutor also postulated that defendant removed most of the blue painter's tape from the barrel after the first robbery, but neglected to remove a little bit at the bottom of the barrel, which was noticeable upon close examination but not in surveillance videos or to witnesses of the robberies.

Our task is not to reweigh the trial evidence but to determine whether the evidence of guilt meets the minimum needed for a reasonable trier of fact to pronounce the defendant guilty. The similarities between the robber of the Little Caesar's and defendant's appearance and behavior in surveillance videos of other robberies linked to

18

him by other evidence, as well as items found in defendant's car, provides sufficient evidence of his guilt.

## DISPOSITION

The judgment of the trial court is affirmed.


BENKE, J.

WE CONCUR:


McCONNELL, P. J.


IRION, J.