Filed 12/9/21

**CERTIFIED FOR PUBLICATION**

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>v.<br><br>JAMIE H. RAMIREZ et al.,<br><br>　　　Defendants and Appellants. | E074402<br><br>(Super.Ct.No. SWF1601096)<br><br>OPINION |

APPEAL from the Superior Court of Riverside County. Kelly L. Hansen, Judge. Affirmed in part as modified; reversed in part.

John F. Schuck, under appointment by the Court of Appeal, for Defendant and Appellant, Jamie H. Ramirez.

Alan S. Yockelson, under appointment by the Court of Appeal, for Defendant and Appellant, Albert Verdugo Villa, Jr.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Arlene A. Sevidal, Randall D.

Einhorn and Elizabeth M. Kuchar, Deputy Attorneys General for Plaintiff and Respondent.

After hearing evidence defendants Jamie Ramirez and Albert Villa participated in a beating of another inmate while in custody at Southwest Detention Center, a jury convicted them of one count of assault with force likely to produce great bodily injury. (Pen. Code, § 245, subd. (a)(4), unlabeled statutory citations refer to this code.) The jury also found true the allegation that defendants committed the assault "for the benefit of, at the direction of, or in association with" a criminal street gang for purposes of the STEP Act[1] gang enhancement. (§ 186.22, subd. (b).) On appeal, defendants argue the record contains insufficient evidence to support their gang enhancements. We agree.

This case highlights the importance of establishing a nexus between a proven "criminal street gang" and the underlying crime. That is, when the prosecution seeks to prove the gang enhancement should apply to a defendant's conviction, the "evidence must permit the jury to infer that the 'gang' that the defendant sought to benefit, and the 'gang' that the prosecution proves to exist, *are one and the same*." (*People v. Prunty* (2015) 62 Cal.4th 59, 75 (*Prunty*), italics added.)

During trial, the prosecution presented evidence that defendants and the inmate who orchestrated the assault each belonged to different Riverside County gangs before they were incarcerated but that they committed the assault for the benefit of the prison gang "La Eme" (also known as the Mexican Mafia). Despite this theory, the prosecution

---

[1] "STEP" stands for Street Terrorism Enforcement and Prevention. (§ 186.20 et seq.)

2

proved that *the three Riverside County gangs* satisfy the STEP Act's definition of a "criminal street gang," but didn't present such proof for *La Eme*, the gang the assault was related to. For example, they didn't present evidence to support a finding that its members engage in a "pattern of criminal gang activity." (§ 186.22, subds. (e) & (f).) In other words, the prosecution proved the existence of the wrong (or irrelevant) gangs. Because the record contains no nexus between the assault and a *proven* gang, the enhancements cannot stand. We therefore vacate that aspect of the jury's verdict but otherwise affirm the judgment.

# I

# FACTS

A.    *The Assault*

On February 24, 2016, a fight broke out in "day room No. 4" among inmates at Southwest Detention Center in Riverside County. A day room is a type of recreation or common room where the inmates generally are allowed to spend about an hour a day, and where, according to jail staff, they tend to congregate or self-segregate according to race.

At trial, the prosecution showed the jury multiple surveillance videos of the fight from different angles. The footage, which we have reviewed, shows about 20 inmates enter day room 4. After about five minutes, two inmates—Albert Ramirez and Arturo Guerrero—appear to exchange words.[2] Albert walks away from Guerrero then quickly walks towards him while making waiving motions to the other inmates. Albert puts his

---

[2] Albert Ramirez was not tried with defendants. To avoid confusion with appellant Jamie Ramirez we will refer to Albert by his first name.

fingers in his mouth briefly before lunging at Guerrero and punching him. After Albert has thrown several blows, five other inmates join in. The fight lasts just over a minute, and Guerrero walks away when it's over.

The surveillance footage has no sound, but a deputy who saw the fight break out said Albert was waiving and whistling at his fellow inmates before he threw the first punch, as a command for them to join him. Jail staff identified defendants as two of the five inmates who joined in the fight.

B.      *Gang Evidence*

1.      *La Eme*

Deputy Torres testified as an expert on La Eme and explained to the jury how the Hispanic prison gang is structured and operates. He said the gang covers Southern California, its territory beginning south of Bakersfield. The top tier of the gang is reserved for members in both state and county detention facilities called "executives" or "tios." Tios or executives maintain control of the county they oversee through intimidation and violence, collecting money from extortions and a portion of all drug sales in county jails.

Occupying the lowest tier of the gang are "Southsiders" or foot soldiers. These are inmates who belonged to gangs outside or on the streets and who haven't yet moved up La Eme's ranks. Deputy Torres said as soon as a local gang member "go[es] into a custodial environment, they leave all rivalries behind, and . . . pledge their alliance to La Eme" and become a Southsider While in custody, they will work together for "the cause"

4

(the collective good of La Eme) in hopes of moving up the ranks and someday becoming an executive or tio. Each tio has, at his disposal, an "army" of Southsiders at every detention facility in his respective county.

"Sureños" occupy the middle tier of the prison gang's hierarchy. In order to become a Sureño, a Southsider must prove himself by "putting in work," which is done by committing assaults and other acts of violence for the benefit of La Eme. Deputy Torres said Southsiders have an obligation to join in on these acts of violence when called upon to do so by other members, especially those in positions of authority. For those Southsiders who don't want to join in or put in work, the detention facility will give them the option of going into protective custody, as such refusals will generally make the Southsider a target within La Eme.

Finally, Torres said each housing unit and day room within a detention facility will have one designated "shot caller" chosen from among the Southsiders in custody. According to Deputy Torres, the shot caller's reputation is everything, so if someone challenges their authority, they must respond, and their fellow Southsiders must help or face repercussions. Deputy's Torres said Albert was the shot caller for dayroom 4.

Crucial to Deputy Torres's opinion about the assault and its cause was the victim's phone conversation with a woman named Elizabeth on the same evening as the assault. During the conversation, Guerrero told Elizabeth to "tell tio, that they got me . . . I guess they fucking, fucking battled with my tio. They fucking got me . . . I'm in the hospital ward right now, in Southwest. They fractured my, um, L3, they fucking broke my, um

5

they fucking fractured my nose. . . like a full fucking nine . . . of them got on me." He told Elizabeth he had confronted "Droopy . . . from Hemet" about being drunk because he "can't be doing drugs, and can't be drinking" and "they gotta respect the boundaries of fucking D's house." He said Droopy swung at him "and the next thing you know he's yelling to have everyone . . . get me."

Deputy Torres reviewed a recording of this conversation and concluded it related to La Eme politics. He believed the "D" in the conversation was a reference to the La Eme executive in charge of Riverside County—a man named David—and the person Guerrero was calling "my tio" was the Los Angeles-based executive to whom Guerrero pledged allegiance. In Deputy Torres's opinion, the recorded conversation was evidence of a power struggle between the Riverside and Los Angeles executives. He believed Guerrero likely had exacerbated the strife between the two factions by calling Albert out for being drunk—that is, for breaking La Eme protocol.

Albert's authority thus challenged, he had no choice but to retaliate. And when he called out to his fellow Southsiders—which included defendants because they belonged to local gangs on the outside—they had to join in or risk being viewed as disloyal.

Guerrero testified as a witness for the prosecution. He denied knowing anything about La Eme or what a "snitch" or "shot caller" was. He said he had started the fight with Albert, as well as another fight earlier in the day with a different inmate, because he was drunk and high and has serious anger issues. Guerrero denied suffering a broken nose and said that his spinal injury was from the other fight, not the one with Albert.

6

However, the prosecution presented the testimony of a physician who had reviewed the x-rays taken of Guerrero after the fight and the surveillance video and said it was entirely possible to sustain a nasal fracture and a spinal injury from the assault.

### 2. *Riverside County Gangs*

The prosecution presented three additional gang experts to testify about Albert's and defendants' gang affiliations before they were incarcerated. Officer Hernandez testified as an expert on South Side Criminals (SSC), a Hemet-based gang with about 30 members. Officer Hernandez believed Albert was a member of SSC because he had admitted his gang membership during a consensual encounter in 2015 and had a number of gang-related tattoos, including the initials "SSC" on the top of his head.

Detective Ontko testified as an expert on East Side Riva (ESR), a Riverside-based gang with over 350 members. He concluded Ramirez was a member of ESR based on his tattoos, as well as the fact he had admitted being "born and bred East Side Riva" during a consensual contact in 2015.

Corona Police Sergeant Griffitts testified as an expert on Corona Varrio Locos (CVL), a Corona-based gang with about 100 members and 11 recognized subsets. He believed Villa belonged to CVL based on his tattoos and the fact he claimed "Corona" and "Crown Town" (both CVL signs) when he entered custody in 2015. Sergeant Griffitts believed Villa also identified as a member of La Eme because he had "South Side" tattooed on his calves.

For each gang, the prosecution did what it had not done with La Eme—they presented evidence in the form of expert testimony and certified records of convictions that members of SSC, ESR, and CVL engaged in a "patten of criminal gang activity" by committing enumerated offenses. (§ 186.22, subds. (e)&(f).)

Finally, the prosecution presented evidence that Guerrero was a member of the East Side Wilmington gang, a gang based in Los Angeles County.

C.      *The Prosecution's Gang Theory*

After both sides rested, defendants brought a motion to dismiss for insufficient evidence under section 1118.1, which the trial judge denied. To support the gang enhancements, the prosecutor argued the evidence demonstrated that "when members of Hispanic street gangs . . . enter[] into a custodial facility, their allegiance is then pledged to the Eme, and they are often referred to as [Southsiders], and [] it is incumbent upon those individuals when a person in the position of authority within that Eme or Sureños hierarchy issues an order to attack another inmate, that they participate in the attack."

The prosecution repeated this theory during closing statements when explaining why Guerrero's beating was gang related. The prosecutor argued he had proved beyond a reasonable doubt defendants had helped Albert assault Guerrero because Albert was a shot caller and joining in the assault could boost their standing in La Eme. He explained, "[Albert]'s the shot caller or the power person in that day room. And when [Albert] says, 'Get [him],' they joined in." Later, the prosecutor argued, "So what you have is you have three individuals, all who are members of different Hispanic criminal gangs, who then all

8

go into custody. When they are in custody, their beefs and differences on the streets are forgotten, because now they are Southsiders, and their allegiance is to La Eme, and they adhere to jailhouse politics."

The prosecutor added, "the one thing we know about the gang culture in custody from all the experts is respect is everything. You cannot be fronted off and let it go, because, well, then somebody might think you're a bitch. . . . So [Albert] must respond. And he does. He does immediately. He starts waving and gesturing and calling out to everybody in the tank. It's time to beat Mr. Guerrero. It's time to beat this East Side Wilmington gang member, show them that this is D's house, and that I, Albert [], am in charge. So it's done at the direction of and in association with a criminal street gang, and it is done with the intent to . . . maintain the power structure that [Albert] enjoys in the tank."

At no point did the prosecutor argue Guerrero's beating was intended to benefit SSC, ESR, or CVL or was done at the direction or in association with those gangs.

In their closings, counsel for defendants argued their clients had joined the fight not to protect Albert's position of power within La Eme but out of self-preservation, because they knew they'd face repercussions if they didn't. Ramirez's counsel emphasized those consequences. "We learned in this case, and you heard from multiple witnesses about jail politics and jail culture, what the person has to do to survive in the jail. You learned that if an inmate with power orders you to join in on a fight, that you must do it, otherwise you'll be the target of assault or something worse."

C.    *Verdict and Sentencing*

The jury convicted defendants of one count of assault with force likely to produce great bodily injury (§ 245, subd. (a)(4)) and found true the allegation they committed the assault for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)(A)). In a bifurcated trial, a different jury found Villa had three prison priors (§ 667.5, subd. (b)) three prior serious felony convictions (§ 667, subd. (a)), and three prior strike convictions (§§ 667, subds. (c), (e) & 1170.12, subd. (c)). Ramirez admitted he had five prison priors.

The judge sentenced Villa to 27 years to life (consisting of a three strikes term of 25 years for the assault plus two years for the gang enhancement) and sentenced Ramirez to seven years in prison (consisting of the upper term of four years for the assault plus three years for the gang enhancement).[3]

# II

# ANALYSIS

Defendants argue there is insufficient evidence to support the gang enhancement because the prosecution didn't establish a nexus between the assault and a *proven* gang. They contend the prosecution failed to prove La Eme satisfied the STEP Act's definition of a criminal street gang despite presenting evidence the assault was related to the prison gang. Specifically, they argue the prosecution failed to present sufficient evidence to support a finding that La Eme's "primary activities" include committing enumerated offenses. Defendants' argument is well taken.

---

[3] The judge struck defendants' prison priors as a matter of law under Senate Bill No. 136 and dismissed Villa's serious felony priors in the interests of justice.

We review claims of insufficient evidence by examining the entire record in the light most favorable to the judgment to determine whether substantial evidence exists for a reasonable jury to find the challenged jury finding true beyond a reasonable doubt. (*People v. Killebrew* (2002) 103 Cal.App.4th 644, 660.) To be substantial, the evidence must be reasonable, credible, and of solid value. (*Ibid.*) In conducting our review, we may not reweigh issues of credibility and we presume the existence of every fact the jury could reasonably deduce from the evidence in support of their verdict. (*Ibid.*) This standard applies to convictions resting primarily on circumstantial evidence, as well as to gang enhancement findings. (*People v. Villalobos* (2006) 145 Cal.App.4th 310, 321-322.)

Section 186.22, also known as the STEP Act, "was enacted in 1988 to combat a dramatic increase in gang-related crimes and violence." (*Prunty*, *supra*, 62 Cal.4th at pp. 66-67.) The law "imposes various punishments on individuals who commit *gang-related crimes*." (*Prunty*, at p. 67.) As relevant here, it authorizes a sentencing enhancement of two, three, or four years on those who commit felonies "for the benefit of, at the direction of, or in association with *any criminal street gang*." (§ 186.22, subd. (b), italics added.)

The STEP Act defines a "criminal street gang" as any "ongoing organization, association, or group of three or more persons" that (i) shares a common name or identifying symbol; (ii) has as one of its "primary activities" the commission of certain enumerated offenses; and (iii) whose members individually or collectively engage in, or have engaged in, "a pattern of criminal gang activity." (§ 186.22, subd. (f).) The statute

11

defines "pattern of criminal gang activity" to mean "the commission of, attempted commission of, conspiracy to commit, or solicitation of, . . . or conviction of *two or more* [enumerated] offenses, provided *at least one of these offenses occurred after the effective date of this chapter and the last of those offenses occurred within three years after a prior offense*, and the offenses were committed *on separate occasions*, or *by two or more persons*." (§ 186.22, subd. (e), italics added.) This requires the prosecution to prove "[t]he predicate offenses [were] committed on separate occasions, or by two or more persons." (*People v. Duran* (2002) 97 Cal.App.4th 1448, 1457, citing *People v. Loeun* (1997) 17 Cal.4th 1, 9-10.) Predicate or enumerated offenses are listed in section 186.22, subdivision (e) and include serious or violent offenses like assault with a deadly weapon or force likely to produce great bodily injury, murder, and attempted murder. (§ 186.22, subd. (e).)

The purpose of the "criminal street gang definition" is to distinguish between criminal organizations and lawful organizations *whose members also happen to commit crimes*. (*People v. Sengpadychith* (2001) 26 Cal.4th 316, 323.)

And finally, to prove a criminal street gang exists for purposes of the gang enhancement, "the prosecution must demonstrate that the gang satisfies the separate elements of the STEP Act's definition and that the defendant sought to benefit *that particular gang* when committing the underlying felony." (*Prunty*, *supra*, 62 Cal.4th at p. 67, italics added.) In other words, the prosecution must establish a nexus between the

gang the defendant sought to benefit and the gang they prove exists. The two gangs must be "one and the same." (*Id*. at p. 75.)

Here, the prosecution failed to establish this nexus. Though their theory was that the assault was committed for the benefit of and in association with La Eme, they didn't present sufficient evidence of the prison gang's primary activities. Deputy Torres testified in a general sense about the criminal activities of La Eme members, explaining they regularly engage in drug sales and commit numerous violent crimes and extortion. But this evidence is too vague to meet the statutory definition of a "pattern of criminal activity." Because the prosecution failed to present evidence of specific predicate offenses "committed on separate occasions, or by two or more persons," they did not prove La Eme is a criminal street gang. (*People v. Duran*, *supra*, 97 Cal.App.4th at p. 1457.) Instead, they provided that proof for three Riverside County gangs, SSC, ESR, and CVL in the form of expert testimony about specific crimes members of those gangs had committed within the required timeframe and certified records of convictions to corroborate that testimony.

The People don't dispute they failed to prove La Eme is a criminal street gang. Instead, they argue the enhancements can be saved on a different theory—that defendants knew Albert was a member of SSC and joined the assault with the specific intent to promote or benefit that gang.

Putting aside the fact this alternate theory is new on appeal and wasn't presented to the jury, we find no support for it in the record. The only evidence on the cause of or

13

reason for the assault came from Deputy Torres, who opined that Albert orchestrated the attack because Guerrero had challenged his authority as a La Eme shot caller. Deputy Torres also believed Guerrero's behavior may have been motivated by his knowledge of a power struggle between his and Albert's tios. The prosecution presented no evidence, direct or circumstantial, to suggest an alternative motive for the assault, let alone one that had to do with the Hemet-based gang SSC.

The People point to the "SSC" tattoo on the top of Albert's head and argue the jury could have reasonably inferred that defendants were aware of the tattoo before and therefore knew which gang Albert belonged to outside. But even if we accept that defendants knew Albert was a member of SSC, the fact remains that the record contains no evidence they joined in the assault to benefit SSC or that they heeded Albert's command because he was a member of that gang. To the contrary, Deputy Torres opined that defendants helped and obeyed Albert because of his standing within *La Eme*, not SSC. Indeed, he told the jury that when inmates pledge their allegiance to La Eme (as he believed Albert and defendants had), they put aside the rivalries held by their local street gangs.

We are also unpersuaded by the cases the People rely on for comparison. The appellate courts in *People v. Garcia* (2016) 244 Cal.App.4th 1349, 1365 and *People v. Villalobos*, *supra*, 145 Cal.App.4th at p. 322 upheld the gang enhancements precisely because the record established a nexus. The gang experts testified the defendants committed the underlying crimes in their gang's territory for the purposes of instilling

14

fear in the community and boosting the gang's reputation with rival gangs. Likewise, in *People v. Leon* (2008) 161 Cal.App.4th 149, the record contained evidence that the defendants committed the underlying crimes in a rival gang's territory, at an apartment complex where members of the rival gang were known to live. (*Id.* at p. 163.) Here, in contrast, there was no evidence that the location and target of the assault was significant to SSC.

The only evidence tying the assault to SSC is Albert's tattoo, which is too thin a basis to support the enhancement, as a defendant's "criminal history and gang affiliations" cannot solely support a finding that a crime is gang-related under section 186.22. (*People v. Martinez* (2004) 116 Cal.App.4th 753, 761.) Rather, the "crime itself must have *some connection with the activities of a gang*." (*Ibid.*, italics added; see also *In re Frank S.* (2006) 141 Cal.App.4th 1192, 1195 [same].) In this vein, evidence that Ramirez belonged to ESR and Villa belonged to CVL is also insufficient, as the STEP Act's gang enhancement "does not criminalize mere gang membership." (*People v. Gardeley* (1996) 14 Cal.4th 605, 623.) "Not every crime committed by gang members is related to a gang." (*People v. Albillar* (2010) 51 Cal.4th 47, 60.)

In order to prove the gang enhancement applied to defendants, the prosecution had to either (i) prove La Eme satisfied the definition of a "criminal street gang" or (ii) establish a nexus between the assault and SSC, ESR, or CVL. Because they did neither, we conclude the record contains insufficient evidence to support the gang enhancements. Given our conclusion, we need not respond to defendants' other contention that the

prosecution used inadmissible hearsay to satisfy the "primary activities" element for ESR, CVL, and SSC—defendants' and Albert's local gangs.

## III

## DISPOSITION

We vacate the true finding on Ramirez's and Villa's gang enhancements and strike the associated punishment. We direct the trial court to prepare amended abstracts of judgment reflecting defendants' verdicts and sentences as modified in this opinion and forward certified copies to the Department of Corrections and Rehabilitation. We otherwise affirm the judgments.

CERTIFIED FOR PUBLICATION

SLOUGH_____
J.

We concur:

McKINSTER_____
Acting P. J.

RAPHAEL_____
J.

16